1    *(Counsel Listed on Next Page)*

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                  NORTHERN DISTRICT OF CALIFORNIA

10   U.S. EQUAL EMPLOYMENT            )   Case No.:  CV 11-3162 YGR
     OPPORTUNITY COMMISSION,          )
11                                    )
                Plaintiff,            )
12   and                             )   **PLAINTIFFS EEOC'S AND KHAN'S**
                                     )   **NOTICE OF MOTION AND MOTION**
13   UMME-HANI KHAN,                  )   **FOR PARTIAL SUMMARY JUDGMENT**
                                     )
14              Plaintiff-Intervenor, )
                                     )
15         vs.                        )   Date:  June 18, 2013
                                     )   Time:  2:00 pm
16   ABERCROMBIE & FITCH STORES, INC. )   Before:  Hon. Yvonne Gonzalez Rogers
     d/b/a HOLLISTER CO., HOLLISTER CO.)
17   CALIFORNIA, LLC                  )
                                     )
18              Defendants.           )
                                     )
19   _____ )

20

21

22

23

24

25

26

27

28

1  William R. Tamayo, SBN 084965 (CA)
   Jonathan T. Peck, SBN 12303 (VA)
2  Marcia L. Mitchell, SBN 18122 (WA)
   Sirithon Thanasombat, SBN 270201 (CA)
3  U.S. EEOC, San Francisco District Office
   350 The Embarcadero, Suite 500
4  San Francisco, CA  94105
   Telephone No. (415) 625-5651
5  Fax No. (415) 625-5657
   Marcia.Mitchell@eeoc.gov; Sirithon.Thanansombat@eeoc.gov
6
   *Attorneys for Plaintiff EEOC*
7
   Zahra Billoo, State Bar No. 267634
8  COUNCIL ON AMERICAN-ISLAMIC
   RELATIONS, CALIFORNIA (CAIR-CA)
9  3000 Scott Blvd., Suite 101
   Santa Clara, CA 95054
10 Telephone: (408) 986-9874
   Facsimile: (408) 986-9875
11 Email: zbilloo@cair.com

12 Christopher Ho, State Bar No. 129845
   Araceli Martínez-Olguín, State Bar No. 236561
13 Marsha J. Chien, State Bar No. 275238
   The LEGAL AID SOCIETY – EMPLOYMENT LAW CENTER
14 180 Montgomery Street, Suite 600
   San Francisco, CA 94104
15 Telephone: (415) 864-8848
   Facsimile: (415) 593-0096
16 Email: cho@las-elc.org; araceli@las-elc.org; mchien@las-elc.org

17 *Attorneys for Plaintiff-Intervenor UMME-HANI KHAN*

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS EEOC'S & KHAN'S MOTION FOR
PARTIAL SUMMARY JUDGMENT

1      PLEASE TAKE NOTICE that on June 18, 2013, at 2:00 p.m. or as soon thereafter as the

2   matter can be heard in the Courtroom of the Honorable Yvonne Gonzalez Rogers, located at

3   Courtroom 5 - 2nd Floor, 1301 Clay Street, Oakland, CA 94612, Plaintiffs Equal Employment

4   Opportunity Commission and Umme-Hani Khan will move for an order granting partial summary

5   judgment in their favor as to liability and on the following of Defendants' affirmative defenses:

6   Sixth (failure to exhaust administrative remedies), Eighth (undue hardship) and Tenth (infringement

7   upon Abercrombie's right to commercial free speech).

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

I.    FACTUAL BACKGROUND ................................................................................................ 1

    A.    Umme-Hani Khan's Religious Beliefs ................................................................ 1

    B.    Abercrombie & Fitch Brand Stores ..................................................................... 2

    C.    Umme-Hani Khan's Work at Abercrombie ......................................................... 2

    D.    Defendants Have No Evidence of Harm to Their Brand ...................................... 5

    E.    Hani Khan's Charge of Discrimination ............................................................. 10

II.   SUMMARY JUDGMENT STANDARD ....................................................................... 11

III.  PLAINTIFFS EXHAUSTED THEIR ADMINISTRATIVE REMEDIES .......................... 11

IV.   DEFENDANTS DISCRIMINATED AGAINST KHAN BECAUSE OF HER RELIGION IN VIOLATION OF TITLE VII ........................................................................................ 12

    A.    Abercrombie Has No Evidence That Umme-Hani Khan Caused Any Harm ............. 15

    B.    Deviations From The Look Policy Have Not Damaged The Brand ........................ 15

    C.    There is No Link Between The Wearing of Hijabs And An Impact On Sales ........... 17

    D.    Abercrombie's Claims Of Customer Confusion Are Unsupported ........................ 18

    E.    Defendants' "Slippery Slope" Argument Has Been Rejected By The Courts ........... 19

    F.    Negligible Claims Cannot Prove Undue Hardship .................................................... 20

V.    DEFENDANTS ALSO VIOLATED CALIFORNIA LAW BY FAILING TO GRANT KHAN A RELIGIOUS ACCOMODATION. ................................................. 20

VI.   PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON DEFENDANTS' COMMERCIAL RIGHT OF FREE SPEECH DEFENSE ....................... 23

    A.    PTI Appearance Is Not Commercial Speech ............................................................. 23

    B.    Even if PTI Appearance is Commercial Speech, Abercrombie's First Amendment rights are not violated. ..................................................................... 23

VII.  CONCLUSION .................................................................................................................. 25

# TABLE OF AUTHORITIES

Page(s)

<u>CASES</u>

*Albemarle Paper Co. v. Moody,*
422 U.S. 405 (1975)................................................................................24

*Anderson v. Gen. Dynamics Convair Aerospace Div.,*
589 F.2d 397 (9th Cir. 1978) ..........................................................14, 18

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986)................................................................................11

*Bolger v. Youngs Drug Products Corp.,*
463 U.S. 60 (1983)..................................................................................23

*Brown v. General Motors Corp.,*
601 F.2d 956 (8th Cir. 1979) ................................................................14

*Brown v. Polk County, Iowa,*
61 F.3d 650 (8th Cir. 1995) (en banc) ...........................................14, 19

*Burns v. Southern Pacific Transp. Co.,*
589 F.2d 403 (9th Cir. 1978) ................................................................20

*Carter v. Oakley,*
849 F. Supp. 673 (E.D. Ark. 1993) ......................................................14

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986)................................................................................11

*Central Hudson Gas & Electric Corp. v. Public Service Comm'n of New York,*
447 U.S. 557 (1980)................................................................................24

*Colmenares v. Braemar Country Club, Inc.,*
29 Cal.4th 1019 (2003) ..........................................................................21

*Cook v. Chrysler Corp.,*
981 F.2d 336 (8th Cir. 1992) ................................................................14

*Draper v. United States Pipe & Foundry Co.,*
527 F.2d 515 (6th Cir. 1975) ................................................................14

*EEOC v. Abercrombie & Fitch Stores, Inc.,*
798 F.Supp.2d 1272 (N.D. Okla. 2011)..................................................8

*EEOC v. Abercrombie & Fitch Stores, Inc.,*
Case No. 09-cv-902-GFK-FHM ..............................................................3

*EEOC v. Abercrombie & Fitch Stores, Inc.*,
Case No. CV 10-3911-EJD (N.D. Cal. April 9, 2013) ....................................................15, 23

*EEOC v. Alamo Rent-a-Car*,
432 F. Supp. 2d 1006 (D. Ariz. 2006) ...............................................................15, 16, 18, 19

*EEOC v. California Psychiatric Transitions, Inc.*,
725 F. Supp. 2d 1100 (E.D. Cal. 2010).................................................................................12

*EEOC v. Llona of Hungary*,
885 F. Supp. 1111 (N.D. Ill. 1995) ......................................................................................16

*EEOC v. Llona of Hungary*,
108 F.3d 1569 (7th Cir. 1997) .............................................................................................16

*EEOC v. Pierce Packing Co.*,
669 F.2d 605 (9th Cir. 1982) ...............................................................................................11

*EEOC v. Red Robin Gourmet Burgers, Inc.*
2005 WL 2090677 (W.D. Wa. Aug. 29, 2005)..........................................................16, 19, 20

*EEOC v. Southwestern Bell Telephone*,
2007 WL 2891379. (E.D. Ark., 2007) .................................................................................19

*EEOC v. Townley & Mfg.*,
859 F.2d 610 (9th Cir. 1988)......................................................................................15, 16, 18

*FEHC v. Gemini Aluminum Corp.*,
22 Cal.App.4th 1004 (2004) ................................................................................................20

*Heller v. EBB Auto Co.*,
8 F.3d 1433 (9th Cir. 1993) .....................................................................................12, 13, 14

*McDonnell Douglas Corp. v. Green*,
411 U.S. 792 (1973)..............................................................................................................13

*McGinnis v. U.S. Postal Service*,
512 F. Supp. 517 (N.D. Cal. 1980) ......................................................................................19

*Opaku-Boateng v. California*,
95 F.3d 1461 (9th Cir. 1996) .........................................................................................13, 19

*Slater v. Douglas County*,
743 F. Supp. 2d 1188 (D. Or. 2010) ....................................................................................16

*Smith v. Pryo Min. Co.*,
827 F.2d 1081 (6th Cir. 1987), *cert. denied,* 485 U.S. 989 (1988)........................................14

*Soldinger v. Northwest Airlines, Inc.*,
51 Cal. App. 4th 345 (1996) ................................................................................................21

*Spence v. Washington,*
    418 U.S. 405 (1974) ........................................................................................24

*Texas Dept. of Com'ty Affairs v. Burdine,*
    450 U.S. 248 (1981) ........................................................................................13

*Tooley v.Martin-Marietta Corp.,*
    648 F.2d 1239 (9th Cir. 1981) .................................................................14, 17

*Trans World Airlines v. Hardison,*
    432 U.S. 63 (1977) ..........................................................................................13

*Valle Del Sol, Inc., v. Whiting,*
    709 F.3d 808 (9th Cir. 2013) ..........................................................................24

*Zalewska v. County of Sullivan, New York,*
    316 F.3d 314 (2d Cir. 2003) ...........................................................................24

## STATUTES

42 U.S.C. §2000e-2(a)(1) ........................................................................................12

42 U.S.C. §2000e-5(e) .............................................................................................11

42 U.S.C. §2000e-5(f) ..............................................................................................12

42 U.S.C. §2000e(j) ..................................................................................................13

Cal. Gov. Code §12960(d) ........................................................................................11

Cal. Gov't Code §12926(t) ..................................................................................21, 22

Cal. Code. Regs. tit. 2, §7293.3(b)(1)-(7) ...............................................................21

## RULES AND REGULATIONS

Federal Rule of Civil Procedure 56 ............................................................................1

**STATEMENT OF RELIEF SOUGHT**

Plaintiffs filed this action alleging that Defendants Abercrombie & Fitch, et al. ("Abercrombie"), violated federal and state anti-discrimination laws by failing to accommodate Umme-Hani Khan's sincere religious belief that she must wear a hijab, or religious headscarf, and by suspending and then firing her after four months of successful performance as an employee in Defendants' stockroom. Plaintiffs move this Court pursuant to Federal Rule of Civil Procedure 56, Fed. R. Civ. P. 56, for partial summary judgment against Abercrombie on liability on their claims regarding religious accommodation, as well as separately with respect to Defendants' Sixth (EEOC's exhaustion of administrative remedies), Eighth (undue hardship)[1] and Tenth (infringement upon Abercrombie's right to commercial free speech) affirmative defenses. *See* Docket Nos. 23 and 31, Answer to EEOC Complaint and Answer to Complaint in Intervention.

**MEMORANDUM OF POINTS AND AUTHORITIES**

I.     **FACTUAL BACKGROUND**

    A.     **Umme-Hani Khan's Religious Beliefs**

Umme-Hani Khan is a Muslim. (Declaration of Marcia Mitchell ("Mitchell Decl.") Exh. 1 [Khan Dep. 17:13-16].) She has been a practicing Muslim since her birth. She was raised in a Muslim family: she, her parents and brother are all practicing Muslims. (*Id.* at 26:5-12.) Ms. Khan believes that Islam dictates that she wear clothes that she considers modest. (*Id.* at 23:7-15.) She further believes that Islam requires her to wear a head scarf, also known as a hijab, when in public or in the presence of men who are not immediate family members. (*Id.* at 17:13-16, 22:7-14, 46:16-47:17.) Ms. Khan began to wear a hijab off and on when she was outside her home in kindergarten. (*Id.* at 38:9-39:2.) By the end of high school, she had fully adopted the religious practice of wearing a hijab in public or when in the presence of males who were not immediate family members. (*Id.* at 50:18-24.)

---

[1] Defendants' sixth affirmative defense (exhaustion of administrative remedies) and Eighth affirmative defense (undue hardship) are incorporated into Plaintiffs' liability arguments. If partial summary judgment is not granted on liability, Plaintiffs request disposition on each of the defenses separately.

**B.      Abercrombie & Fitch Brand Stores**

Abercrombie & Fitch operates retail stores across the country under the brand names Abercrombie & Fitch, Hollister and abercrombie kids.[2]  As of January 30, 2010, Abercrombie had 1096 stores domestically and internationally, and 80,000 associates, some of which were Part-time Impact associates (stockroom employees) and others were Models (sales associates).  (Mitchell Decl. Exh. 2 [2009 Annual Report].)  Abercrombie operated Abercrombie & Fitch and Hollister brands at the Hillsdale Mall in San Mateo, CA.  (Mitchell Decl. Exh. 3 [Chmielewski Dep. 95:7-15].)

At all times from 2005 to the present, Abercrombie has had a "Look Policy."  The Look Policy is a grooming policy that gives associates guidelines regarding their appearance and the clothing they are expected to wear while at work.  (Mitchell Decl. Exh. 4 [Riley Dep. 135:16-25].)  Abercrombie requires all employees in its Abercrombie & Fitch, Hollister and abercrombie kids stores to comply with its Look Policy.  (Mitchell Decl. Exh. 5 [Riley-Tulsa Dep. 18:1-17].)  The Look Policy required employees to wear clothes similar to those sold in Abercrombie stores, though employees were not required to wear Abercrombie clothing.  (Mitchell Decl. Exh. 4 [Riley Dep. 136:1-6, 202:4-8].)  In 2010, the policy prohibited employees from wearing headwear.  (Mitchell Decl. Exh. 6 [TULSA-AF_003433-34].)  The Look Policy also required employees to wear specific types of shoes (flip flops, Converse sneakers or Vans sneakers), prohibited facial hair, and restricted the type of jewelry an associate could wear.  (Mitchell Decl. Exh. 4 [Riley Dep. 136:11-137:9, 140:17-141:3, 204:2-11].)  The policy further prohibited employees from wearing apparel, including shoes, that have obvious logos from non-Abercrombie stores.  (*Id*. at 136:1-9].)

**C.      Umme-Hani Khan's Work at Abercrombie**

In October 2009, Ms. Khan was hired to work at a Hollister store in the Hillsdale Mall in San Mateo, CA.  (Mitchell Decl. Exh. 1 [Khan Dep. 218:3-5].)  Ms. Khan was interviewed and hired for her position at Hollister while wearing her headscarf.  (*Id*. at 67: 3-12, 69:5-12, 74:22-25.)  Local supervisors permitted Ms. Khan to wear her headscarf so long as it matched company colors.  (*Id*. at 69:5-12, 84:16-21.)  Ms. Khan wore her headscarf at work from the time of her hire until her

---

[2] Abercrombie & Fitch Co. was incorporated in 1996 and operates through subsidiaries under the brands Abercrombie & Fitch, Hollister, abercrombie kids and Gilly Hicks.  Plaintiffs will use the term "Abercrombie" throughout the brief to refer to the brands collectively.

1   termination in February 2010.  (Khan Decl. ¶¶ 3, 5.)  Ms. Khan also regularly wore long-sleeved

2   shirts and jeans purchased at Hollister along with a pair of flip-flops to work.  (*Id*. at ¶ 4.)  Ms. Khan

3   worked for Defendants without incident, wearing her hijab, from October 2009 until February 2010.

4   (Mitchell Decl. Exh. 1 [Khan Dep.84:16-21].)

5          Ms. Khan worked as a Part-Time Impact Associate ("PTI") from October 2009 to February

6   2010.  The PTI position is entry-level.  (Mitchell Decl. Exh. 4 [Riley Dep. 79:11-80:2].)  PTIs are

7   essentially stock room employees.  (Mitchell Decl. Exh. 11 [Yoakum Dep. 59:2-60:1].)  In 2010, the

8   Hollister store in Hillsdale Mall had approximately 50 employees, of which approximately 20 were

9   PTIs.  The PTIs worked an average of 10 hours per week.  (Mitchell Decl. Exh. 3 [Chmielewski

10  Dep. 95:16-97:4].)  Ms. Khan performed her duties primarily in the back room, but some of her

11  duties were performed on the sales floor.  She was responsible for preparing the merchandise for the

12  floor, including getting the shipment, folding the clothes, placing it on the floor, and replacing the

13  items throughout the day.  The unpacking of the boxes would take place in a stockroom or outside of

14  public view.  (Mitchell Decl. Exh. 1 [Khan Dep. 76:3-77:24].)  The PTIs are not evaluated on

15  appearance during interviews and their primary function is not to model or advertise clothing.

16  (Mitchell Decl. Exh. 4 [Riley Dep. 86:3-13]; Exh. 7 [Moorefield Dep.[3] 34:16-23, 52:3-13].)  In

17  contrast, Models were employed for the express purpose of advertising the brand.  (Mitchell Decl.

18  Exh. 7 [Moorefield Dep. at 97:5-98:7, 102:19-103:8]; Exh. 8 [Moorefield Dep. Ex. 4].)

19         On or about February 11, 2010, Defendants' District Manager, Adam Chmielewski, observed

20  Ms. Khan wearing a hijab while she worked.  (Mitchell Decl. Exh. 9 [TULSA-AF-4392-99].)

21  Besides the hijab, he didn't recall her being out of compliance with the Look Policy in any other

22  way.  (Mitchell Decl. Exh. 3 [Chmielewski Dep.182:24-183:13].)  Mr. Chmielewski e-mailed Amy

23  Yoakum,[4] Senior Manager of Human Resources ("HR"), for guidance on how to address the

24  situation.  (Mitchell Decl. Exh. 3 [Chmielewski Dep. 101:9-103:8]; Exh. 11 [Yoakum Dep. 61:13-

25

26  _____

    [3] Chad Moorefield, a Director of Stores, testified on behalf of Abercrombie as a Rule 30(b)(6)
27  witness in *EEOC v. Abercrombie & Fitch Stores, Inc.*, 09-cv-902-GFK-FHM (N..D. OK).  (Mitchell
    Decl. Exh. 7 [Moorefield Dep. 10:23-20, 69:7-23]; Exh. 10 Moorefield Dep. Ex. 1].)

28  [4] Yoakum was responsible for handling requests to deviate from the Look Policy for religious or
    medical reasons.  (Mitchell Decl. Exh. 11 [Yoakum Dep. 26:21-27:8, 45:5-46:5, 47:12-17].)

62:3 70:12-25, 72:2-22]; Exh. 9 [TULSA AF-4392-99].)  Ms. Yoakum directed Mr. Chmielewski to arrange a meeting with Ms. Khan about her hijab, adding, "If she responds that it is against her religion and she can't [take off her hijab while working], we will tell her that she will be taken off the schedule and once we have made a decision we will notify her…. We will then request her last check and when it comes we will set a time for her to come in and terminate her employment." (Mitchell Decl. Exh. 9 [TULSA AF-4392-99].)

On February 15, 2010, during a conference call, Ms. Yoakum told Ms. Khan that her headscarf was in violation of the Look Policy and asked Ms. Khan if she could take it off while she worked.  (Mitchell Decl. Exh. 1 [Khan Dep. 107:22-109:10]; Ex. 9 [TULSA AF-4392-99].)  Ms. Khan responded that she could not take the headscarf off because it was part of her religion.  (*Id.*)  Ms. Yoakum informed Ms. Khan that she would be suspended.  (Mitchell Decl. Exh. 11 [Yoakum Dep. 63:5-15].)

On or about February 22, 2010, Ms. Khan, Ms. Yoakum and Mr. Chmielewski had a second conference call.  (Mitchell Decl. Exh. 3 [Chmielewski Dep. 144:23-145:8]; Exh. 11 [Yoakum Dep. 64:3-65:5].)  Prior to the conference call, Defendants prepared her final paycheck.  (Mitchell Decl. Exh. 11 [Yoakum Dep. 101:23-103:3].)  During the call, Ms. Yoakum asked again whether Ms. Khan could remove her headscarf while she was on the clock.  (*Id.* at 64:3-65:5].)  When Ms. Khan responded, again, that to do so would violate her religious beliefs, Ms. Yoakum fired her and instructed Mr. Chjmielewski to give Ms. Khan her final paycheck.  (*Id.* at 101:23-103:3.)  Ms. Khan's refusal to remove her hijab was the sole reason for her suspension and termination.  (Mitchell Decl. Exh. 9 [TULSA AF-4392-99]; Exh. 11 [Yoakum Dep. 61:11-23, 62:24-64:19, 99:13-18].)

Neither Mr. Chmielewski nor Ms. Yoakum asked Ms. Khan whether she was able to wear an alternative style of hijab or whether she was willing to wear the hijab in one of Abercrombie's core colors (blue, grey or white).  (Mitchell Decl. Exh. 1 [Khan Dep. 107:22-109:10]; Exh. 4 [Riley Dep. 226:3-9].)  Ms. Khan had been wearing her hijab in the core colors throughout her employment.  The only option Abercrombie offered was for her to comply with the Look Policy.  (Mitchell Decl. Exh. 11 [Yoakum Dep. 96:13-16].)  In March 2010, Abercrombie offered Ms. Khan reinstatement to a

1   PTI position without any restrictions about working on the floor.  (Mitchell Decl. Exh. 1 [Khan Dep.

2   139:17-140:5].)

3          Defendants did not receive any complaints or negative comments from customers regarding

4   Ms. Khan's employment or her presence in the store.  (Mitchell Decl. Exh. 3 [Chmielewski Dep.

5   155:12-16].)  Defendants have no evidence attributing a decline in sales to Ms. Khan's employment.

6   *See* discussion *infra.* at 8-9.

7          After firing Ms. Khan, Abercrombie began to accommodate the wearing of religious

8   headscarves in associate positions, and several such accommodations have been granted.  *See infra.*

9   at 6.  (Mitchell Decl. Exh. 12 [Passalacqua Dep. 193:19-194:9]; Exh. 13 [Fugarino Dep. 24:15-17,

10  260:7-17].)   Abercrombie began making changes in its policies relating to hijabs as a result of Ms.

11  Khan's case.  (Mitchell Decl. Exh. 13 [Fugarino Dep. 260:7-17].)  Abercrombie adopted sketches of

12  acceptable hijab styles.  (*Id.* at 254:13- 256:23; Exh. 14 [Fugarino Dep. Ex. 19].)  The hijabs for

13  PTIs were the same style that Ms. Khan wore.  (Khan Decl ¶ 5.)  In August 2010, Abercrombie

14  added language to its hairstyle sketchbook that "for religious and disability purposes . . . associates

15  may be permitted to wear head coverings that are otherwise brand appropriate."  (Mitchell Decl.

16  Exh. 15 [Yoakum Dep. Ex. 10 at AF00188].)  Since Abercrombie offered Ms. Khan reinstatement

17  and revised its practices, Abercrombie has permitted several associates to wear hijabs as a religious

18  accommodation.  (Mitchell Decl. Exh. 5 [Riley-Tulsa Dep. 91:6-92:24].)

19          **D.      Defendants Have No Evidence of Harm to Their Brand**

20          At times, Abercrombie permits its employees to deviate from the Look Policy.  Requests for

21  exceptions to the Look Policy, including those for religious accommodation, must be directed to and

22  approved by Abercrombie's HR. Dept. in its corporate headquarters.  (Mitchell Decl. Exh. 4 [Riley

23  Dep. 43:9-21, 46:23-47:18, 150:12-151:3].)  Abercrombie's corporate HR Dept. is centralized: it

24  provides human resources support for all stores across all three Abercrombie brands.  (*Id.* at 55:13-

25  25].)

26          Some requests for exceptions to the Look Policy are granted and some are denied.  The

27  requests and HR's disposition of those requests are documented in a HR Contact Record database.

28  (Mitchell Decl. Exh. 4 [Riley Dep.122:15-24, 126:13-127:16].)  According to Group Vice President

of HR for Stores, Deon Riley,[5] HR Managers are permitted to grant exceptions to the Look Policy when the exception will not hurt the brand.  (*Id*. at 46:23-47:18].)

Abercrombie permitted several employees in a variety of positions to wear head coverings before Ms. Khan's termination.  In February 2006, Abercrombie permitted a PTI to wear a hat to hide scars on his head.  (Mitchell Decl. Exh. 16 [TULSA-AF_004193].)  In 2007, Abercrombie permitted a Jewish Model to wear a yarmulke (*id*. at Exh. 17 [TULSA-AF_004391]); allowed a Manager-in-Training to wear a cap because his medication was making his hair fall out and permitted a PTI to wear a head scarf as a religious accommodation (*id*. at Exh. 18 [TULSA-AF_004110]; Exh. 19 [TULSA-AF_004313], respectively).  In March 2008, Abercrombie permitted an Assistant Manager to wear a hat because of his obsessive compulsive disorder.  The accommodation was renewed every six months and lasted at least a year.  (Mitchell Decl. Exh. 4 [Riley Dep. 284:20-286:22]; Exh. 20 [TULSA-AF_004436];Exh. 21 [TULSA-AF_004234-39].)  In February 2009, a Model received an accommodation to wear a yarmulke.  (Mitchell Decl. Exh. 22 [TULSA-AF_004449].)

Since December 2008, Abercrombie has accommodated at least 12 PTI employees who wore headscarves.  (Mitchell Decl. ¶3; Exh. 23 [9 Head Scarf Contact Records].)  Abercrombie also has permitted its Models to wear head scarves for religious reasons in certain styles since 2010.  (Mitchell Decl. Exh. 4 [Riley Dep. 187:6-188:16, 190:18-191:16, 196:19-197:12].)  Defendants allowed a Model to wear a headscarf in March 2010 around the same time they offered Ms. Khan reinstatement.  (Mitchell Decl. Exh. 24 [TULSA-AF_004382-83].)

Notably, in several instances, Abercrombie granted the requests by Models to deviate from the Look Policy conditioned on the employee's agreement to work as a PTI.  In September 2007, Abercrombie told a new hire she could wear a skirt that fell below her knees if she accepted a PTI position.  (Mitchell Decl. Exh. 25 [TULSA-AF_004041].)  In December 2008, Abercrombie transferred a Model to a PTI position so she could continue wearing her hijab.  (Mitchell Decl. Exh.

---

[5] Deon Riley testified as a Rule 30(b)(6) witness as to the following topic: the effect and/or impact, if any, of allowing any and all exceptions to and/or deviations from the Look Policy . . . including but not limited to the details of any and all studies, reports or analyses performed by or at the direction of Defendants to assess such impact.  (Mitchell Decl. Exh. 5 [Riley-Tulsa Dep. 6:3-12].)

1   26 [TULSA-AF_004309].)  In July 2009 and December 2011, Models were offered PTI positions as

2   accommodation for their hijabs, but quit instead of accepting the accommodation.  (Mitchell Decl.

3   Exh. 27 [TULSA-AF_004404]; Exh. 28 [AF_1392-1400].)  Other associates were permitted to wear

4   religious jewelry, including bracelets, necklaces and earrings if they agreed to work as a PTI.

5   (Mitchell Decl. Exh. 29 [TULSA-AF_004790]; Exh. 30 [TULSA-AF_004302]; Exh. 31 [TULSA-

6   AF_004281-84]; Exh. 32 [TULSA-AF_004286].)  And still others were told they could not work as

7   Models with facial hair, but could transfer to PTI positions.  (Mitchell Decl. Exh. 33 [TULSA-

8   AF_004354]; Exh. 34 [TULSA-AF_004063].)

9       Abercrombie's HR Dept. has for years approved a variety of other exceptions that were

10  noticeably out of compliance with the Look Policy.  In November 2007, Abercrombie

11  accommodated an employee who had been wearing a full beard "for months" because he was a good

12  worker.  (Mitchell Decl. Exh. 4 [Riley Dep. 206:3-12, 208:15-25]; Exh. 35 [TULSA-AF_004791].)

13  Abercrombie also permitted an associate to wear grey boots although it has never sold boots.

14  (Mitchell Decl. Exh. 4 [Riley Dep. 219:23-221:16]; Exh. 36 [TULSA-AF_004135].)  Abercrombie

15  permitted a PTI to wear a pair of grey Nike shoes with a blue Nike symbol and allowed an Assistant

16  Manager to wear Nike shoes with a pink swoosh although the competitor's logo is considered "brand

17  damaging."  (Mitchell Decl. Exh. 4 [Riley Dep. 222:3-223:18]; Exh. 37 [TULSA-AF_004164]; Exh.

18  38 [TULSA-AF_004440].

19      Abercrombie also has permitted approximately 20 male employees to work with facial hair

20  for religious and medical reasons (Mitchell Decl. ¶4; Exh. 39 [15 Facial Hair Contact Records]);

21  allowed 13 other employees to wear footwear other than approved footwear for medical reasons

22  (Mitchell Decl. ¶4; Exh. 53 [13 Footwear Contact Records]); allowed female employees to wear

23  long skirts inconsistent with skirts sold in the stores for religious reasons (*id*. at Exh. 40 [TULSA-

24  AF_004293]; Exh. 41 [TULSA-AF_004097]); allowed male employees to yarmulkes for religious

25  reasons (*id*. at Exh. 17 [TULSA-AF_004391]; Exh. 42 [TULSA-AF_004450]); and, allowed an

26  employee to wear a green Livestrong style bracelet as a memorial to a friend who died in combat (*id*.

27  at Exh. 43 [TULSA-AF_004131]).  In total, Abercrombie has granted at nearly 90 exceptions to the

28

1   Look Policy since 2006.  (Mitchell Decl. Exh. 44 [26 HR Contact Records][6].)

2          In an interview reported by the New York Times (online) on September 23, 2010,

3   Defendants' General Counsel, Ronald A. Robins, Jr., said that Abercrombie "makes every

4   reasonable attempt to accommodate the religious practices of associates and applicants, including,

5   where appropriate, allowing associates to wear a hijab."  (Mitchell Decl. Exh. 45 [New York

6   Times.com article]; Exh. 5 [Riley-Tulsa Dep. 92:17-24, 236:1-6]; Exh. 46 [Def. Response to Pl.

7   Third Set of Requests for Admissions, Nos. 1 and 2].)  Nevertheless, corporate officials continue to

8   insist that every Look Policy accommodation, including those for headscarves, is distracting and

9   damaging to the brand.  (Mitchell Decl. Exh. 4 [Riley Dep. 188:17-189:11]; Exh. 3 [Chmielewski

10  Dep. 200:1-20]; Exh. 12 [Passalacqua Dep. 138:4-16, 207:10-23, 93:19-94:6, 95:1-96:15]; Exh. 13

11  [Fugarino Dep. 234:17-235:5]; Exh. 11 [Yoakum Dep. 291:20-292:9, 234:8-19].)

12         Abercrombie has not taken any steps to determine whether HR-approved exceptions to the

13  Look Policy have resulted in any measureable harm to its brand or its business operations.

14  Defendants are unable to say whether allowing employees to wear headscarves or otherwise deviate

15  from the Look Policy has had a negative impact on sales or any other measurable effect on

16  profitability.  (Mitchell Decl. Exh. 5 [Riley-Tulsa Dep. 236:7-19]; Exh. 47 [Passalacqua-St.Louis

17  Dep. 20:21-21:11, 32:24-34:3]; Exh. 4 [Riley Dep. 189:17-190:11]; Exh. 12 [Passalacqua Dep.

18  96:16-24, 191:22-192:22]; Exh. 11 [Yoakum Dep. 260:20-261:19].)[7]  Indeed, sales trends in stores

19  do not factor into whether an accommodation will be granted.  (Mitchell Decl. Exh. 13 [Fugarino

20  Dep. 24:15-17, 72:23-73:4].)

21         Abercrombie uses various reports to ensure the Look Policy is consistently applied: store

22  audits, district manager audits, regional manager audits, home office audits and secret shopper

23  reports.  (Mitchell Decl. Exh. 3 [Chmielewski Dep. 87:13-88:2]; Exh. 48 [McKinsey Dep. 16:23-

---

[6] All remaining HR Contact Records which are not cited individually herein have been attached collectively as Exhibit 44 to the Mitchell Declaration.

[7] Through Riley, Defendants admitted that it had conducted only one study to assess the effect of exceptions to the Look Policy on the operation of its business.  (Mitchell Decl. Exh. 5 [Riley-Tulsa Dep. 13:6-15:13].)  The study was conducted by Erich Joachimsthaler, Ph.D, who was retained as an expert witness in prior cases.  That study lacked empirical data and was rejected by the Northern District of Oklahoma as unreliable in *EEOC v. Abercrombie & Fitch Stores, Inc.*, 798 F.Supp.2d 1272, 1287 (N.D. Okla. 2011).

17:5, 80:17- 81:12].)  According to Jessica Passalacqua,[8] Defendants' Directors of Stores regularly review financial performance and analyze sales for each store.  (Mitchell Decl. Exh. 47 [Passalacqua-St.Louis Dep. 5:14-6:8, 23:18-24:3].)  They, along with Regional Managers also review a Weekly Summary of all stores related to Abercrombie's Secret Shopper program.  The Weekly Summary scores stores within specific categories deemed critical to Abercrombie's business operations.  Look Policy adherence is captured under the category of "store experience" as well the subcategory of "properly dressed" within the "store experience" category.  (Mitchell Decl. Exh. 47 [Passalacqua-St.Louis Dep. 15:20-17:20]; Exh. 48 [McKinsey Dep. 30:18-33:5].)  Although it collects data on the performance of stores, Abercrombie has no empirical evidence reflecting that a drop in "store experience" ratings or "properly dressed" ratings has any correlation with a drop in sales.  (Mitchell Decl. Exh. 49 [Roth Dep. 15:6-16:7, 188:19-23].)  Pre-existing low audit scores for store experience do not affect whether an accommodation would be granted.  (Mitchell Decl. Exh. 13 [Fugarino Dep. 74:10- 75:3].)  According to 30(b)(6) witness Chad Moorefield, "You're guessing essentially."  (Mitchell Decl. Exh. 7 [Moorefield Dep. 196:1-197:15, 202:7-203: 21, 212:12-215:3, 208:15].)

Abercrombie claims it does not look at the financial impact of an employee not adhering to the Look Policy: the focus of Abercrombie's analysis "in terms of the Look Policy is more on brand experience and reputation."  (Mitchell Decl. Exh. 47 [Passalacqua-St.Louis Dep. 32:24-34:3].)  Yet, Abercrombie has not measured whether exceptions to the Look Policy have affected its customers' views of the Abercrombie style and brand.  (Mitchell Decl. Exh. 5 [Riley-Tulsa Dep. 15:10-16:1, 129:4-24, 236:1-19]; Exh. 49 [Roth Dep. 123:18-23].)  Abercrombie does not consult with outside marketing experts, branding or fashion experts or experts on consumer behavior in determining whether to grant a Look Policy exception.  (Mitchell Decl. Exh. 13 [Fugarino Dep. 78:4-13].)  Abercrombie does not make any efforts to track repeat customers to find out why they return, or,

---

[8] In 2008, Jessica Passalacqua was the Director of Stores in the Western Region for all Abercrombie brands.  She testified as a 30(b)(6) witness regarding "the Look Policy, its application, importance to the A&F and Hollister brands and any and all studies or reports on the economic impact of an employee or employees deviating from the Look Policy."  (Mitchell Decl. Exh. 47 [Passalacqua-St.Louis Dep. 6:18-23, 7:3-14].)

1    conversely, why they do not come back.  (Mitchell Decl. Exh. 48 [McKinsey Dep. 210:6-11]; Exh.

2    12 [Passalacqua Dep. 183:18-25].)  No customers have complained about associates wearing head

3    scarves.  (Mitchell Decl. Exh. 4 [Riley Dep. 286:23-287:5, 288:12-21]; Exh. 11 [Yoakum Dep.

4    289:23-290:12].)  Defendants have not conducted customer surveys or convened focus groups to

5    determine whether permitting exceptions to the Look Policy have affected its customers' views of

6    the Abercrombie style or brand.  (Mitchell Decl. Exh. 5 [Riley-Tulsa Dep. 129:4-24]; Exh. 11

7    [Yoakum Dep. 291:5-12]; Exh. 49 [Roth Dep. 188:19-23]; Exh. 13 [ Fugarino Dep. 314:2-4].)  And,

8    none of Defendants witnesses have ever spoken to any customers about whether they find head

9    scarves or other Look Policy exceptions distracting to the brand.  *See, e.g.,* (Mitchell Decl. Exh. 4

10   [Riley Dep. 189:12-16]; Exh. 11 [Yoakum Dep. 291:5-12, 289:23-290:13].)

11        Defendants' argument that deviations from the Look Policy negatively impact the brand are

12   based on personal opinions derived from isolated experiences.  Yoakum once saw an associate with

13   a tongue ring and personally felt that the experience was "different" (Mitchell Decl. Exh. 50

14   [Yoakum-Tulsa Dep. 67:9-68:19, 86:2-89:16]); Chmielewski's co-worker said he purposely wore

15   clothes outside Look Policy so he could avoid helping customers (*id*. at Exh. 3 [Chmielewski Dep.

16   62:5-14]); Fugarino saw a customer leave a store after speaking to a friendly associate with

17   "distracting" eye make-up and a nose ring and assumed, without speaking to the customer, that the

18   customer was offended by the associate's appearance (*id*. at Exh. 13 [Fugarino Dep. 236:1-237:18,

19   238:12-240:17]).

20        Passalacqua opined that one exemption from the Look Policy could result in a breakdown of

21   Abercrombie's control over the Hollister experience; nevertheless, she and other managers conceded

22   that Abercrombie had not lost control of the in-store experience due to any of the exceptions to the

23   Look Policy which Abercrombie has granted.  (Mitchell Decl. Exh. 47 [Passalacqua-St.Louis Dep.

24   63:8-12, 67:18-68:18]; Exh. 13 [Fugarino Dep. 182:2-186:4].)

25        **E.      Hani Khan's Charge of Discrimination**

26        Ms. Khan perfected a charge of religious discrimination ("Charge") with the EEOC on

27   March 1, 2010, six days after she was fired.  The charge was dually filed with the California

28   Department of Fair Employment and Housing.  The EEOC notified Defendants about the charge on

1   March 8, 2010.  (Declaration of Michael Baldonado ("Baldonado Decl.") Exhs. 1 & 2.)  On

2   September 24, 2010, the EEOC issued a Letter of Determination based on its investigation finding

3   reasonable cause to believe that Abercrombie discriminated against Ms. Khan due to her religion and

4   invited Abercrombie to conciliate Ms. Khan's charge.  (Baldonado Decl. Exh. 3.)  The conciliation

5   process ended in January 2011, although the parties continued settlement negotiations through May

6   2011.  Plaintiff EEOC filed this lawsuit on June 27, 2011.  Ms. Khan's motion to intervene was

7   granted on September 8, 2011 (Docket No. 27).

8   **II.   SUMMARY JUDGMENT STANDARD**

9          A moving party is entitled to summary judgment if based on the pleadings, depositions,

10  answers to interrogatories, and any affidavits submitted, there is "no genuine issue as to any material

11  fact and that the moving party is entitled to judgment as a matter of law."  *Celotex Corp. v. Catrett,*

12  477 U.S. 317, 323 (1986*).*  If a party fails to establish the existence of an essential element of its case

13  on which it has the burden of proof, the moving party is entitled to judgment as a matter of law.  *Id.*

14  Whether a fact is material is determined for summary judgment purposes by looking to relevant

15  substantive law.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986).

16  **III.   PLAINTIFFS EXHAUSTED THEIR ADMINISTRATIVE REMEDIES**

17         There are four conditions precedent which the EEOC must satisfy prior to bringing suit.  The

18  EEOC must: (1) receive a timely charge of discrimination and provide notice to the employer

19  thereof; (2) conduct an investigation; (3) determine that reasonable cause exists to believe that

20  discrimination has occurred; and (4) attempt to eliminate any alleged unlawful employment practice

21  by informal methods of conference, conciliation, and persuasion.  *EEOC v. Pierce Packing Co*., 669

22  F.2d 605, 607 (9th Cir. 1982).

23         It is undisputed that Ms. Khan filed and perfected a charge of religious discrimination with

24  the EEOC and DFEH within a week of her termination alleging discrimination on the basis of her

25  religion and for failure to grant a religious accommodation, well within the respective 300 day and

26  one-year statutes of limitation under Title VII and FEHA, respectively.  *See* 42 U.S.C. §2000e-5(e);

27  Cal. Gov. Code §12960 (d).

28         The EEOC notified Defendants about the charge and conducted an investigation.

PLAINTIFFS EEOC'S & KHAN'S MOTION FOR
PARTIAL SUMMARY JUDGMENT

1   (Baldonado Decl., Exhs. 1 & 2).  The EEOC requested information and documents from

2   Abercrombie and interviewed witnesses.  (Baldonado Decl., ¶4.) The scope of the investigation is

3   within the EEOC's discretion.  *EEOC v. California Psychiatric Transitions, Inc.*, 725 F. Supp. 2d

4   1100, 1114 (E.D. Cal. 2010) ("Whether the EEOC could or should do more [in an investigation] is

5   within the discretion of the EEOC.").

6           After completing the investigation, the EEOC concluded that there was reasonable cause to

7   believe that Abercrombie had violated Title VII.  The EEOC issued a Letter of Determination to

8   Abercrombie setting forth its investigatory findings.  (Baldonado Decl., ¶4, Exh. 3.)  The EEOC is

9   authorized to file suit thirty days after the filing of a charge "if the Commission has been unable to

10  secure [from defendant] a conciliation agreement *acceptable to the Commission*."  42 U.S.C.

11  §2000e-5(f) (emphasis added).  Here, the EEOC attempted to conciliate Ms. Khan's charge from

12  September 2010 until May 2011, prior to filing suit. Those efforts were unsuccessful and the EEOC

13  filed suit.  Ms. Khan moved to intervene in the EEOC's action to vindicate her rights under both

14  federal and state law.  Because Plaintiffs have exhausted their administrative remedies as a matter of

15  law, the Court should enter judgment against Defendants as regards this defense.

16  **IV.   DEFENDANTS DISCRIMINATED AGAINST KHAN BECAUSE OF HER
            RELIGION IN VIOLATION OF TITLE VII[9]**

17

18          Title VII prohibits employers from discriminating on the basis of religion.  42 U.S.C.

19  §2000e-2(a)(1); *Heller v. EBB Auto Co.,* 8 F.3d 1433, 1437 (9th Cir. 1993). Religion is broadly

20  defined to include "all aspects of religious observance and practice."  42 U.S.C. §2000e-2(a)(1).

21  Religious discrimination can consist of either disparate treatment or the failure to provide religious

22  accommodation.  Plaintiffs move for partial summary judgment on their claims that Abercrombie

23  failed to accommodate Ms. Khan's sincerely-held religious belief that Islam required her to wear a

24  hijab at work.

25

26  [9] Plaintiffs summarize here, but do not repeat, the legal analysis of the Ninth Circuit standard for
    undue hardship submitted to the court on March 15, 2103.  Plaintiffs' Supplemental Briefing
27  Regarding the Undue Hardship Standard Under Title VII and the California Fair Employment and
    Housing Act.  (Docket No. 93.)  The standard set forth therein is incorporated by reference in its
28  entirety.

1   The Ninth Circuit applies a two-part frame-work to analyze Title VII religious

2   accommodation claims.  Plaintiffs must first establish a *prima facie* case by showing that Ms.  Khan:

3   (1) had a bona fide religious belief; (2) informed Abercrombie of a conflict between her religious

4   belief and her responsibilities as an employee; and (3) was subjected to discriminatory treatment due

5   to her inability to fulfill the disputed job duty.  *Heller v. EBB Auto Co.,* 8 F.3d 1433, 1438 (9th Cir.

6   1993)  Here, Defendants cannot and do not dispute the prima facie case.  (Docket No. 95 [Transcript

7   of Hearing on February 27, 2013 8: 22-24]; Docket No. 80 [Defendants' Response to Plaintiffs'

8   Request for Pre-Filing Conference].)  Defendants can offer no evidence to dispute that Ms. Khan is

9   Muslim and believes that Islam required her to wear a hijab while at work.  (Mitchell Decl. Exh. 1

10  [Khan Dep. 48:17-20, 50:18-24].)  It is also undisputed that Senior HR Manager, Amy Yoakum,

11  asked Ms. Khan to remove her hijab at work and that Ms. Khan informed her that doing so would

12  conflict with her religious belief.  (Mitchell Decl. Exh. 11 [Yoakum Dep. 63:7-64:18].])  When Ms

13  Khan declined to remove her hijab, Ms. Yoakum suspended her and shortly thereafter fired her.  (*Id.*

14  at 63:5-15, 64:12-19.])  The hijab was the sole reason for the suspension and termination.  Plaintiffs

15  have established all three prongs of the *prima facie* case.

16  Having made out a *prima facie* case, the burden of proof shifts to Abercrombie to prove that

17  it initiated good faith efforts to accommodate Ms. Khan's beliefs; Abercrombie is relieved from its

18  duty to attempt to provide an accommodation only if it can prove that the accommodation is an

19  undue hardship in that it will cause more than a "de minimis" burden on the conduct of its business.

20  *See* 42 U.S.C. §2000e(j); *Trans World Airlines v. Hardison*, 432 U.S. 63, 74 (1977).  It is undisputed

21  that the only option presented to Ms. Khan to keep her job was to remove her headscarf.  (Mitchell

22  Decl. Exh. 11 [Yoakum Dep. 96:13-16].)  Since the option presented to Ms. Khan did not eliminate

23  the religious conflict, Abercrombie's only recourse is proving the undue hardship affirmative

24  defense.  *Opaku-Boateng v. California,* 95 F.3d 1461, 1467 (9th Cir. 1996).

25  An undue hardship defense will fail absent a showing of actual harm to the employer [10].  The

26

27  [10] An employer's burden of proving undue hardship is more exacting than its burden of production in
    a disparate treatment claim.  In disparate treatment cases, the employer bears the burden of
28  production, not proof.  It must respond to the plaintiff's *prima facie* case with an explanation for its
    allegedly discriminatory actions and is never required to prove the truth of its explanation.

Ninth Circuit has long been "skeptical of 'hypothetical hardships' based on assumptions about accommodations which have never been put into practice." *Heller v. EBB Auto*, 8 F.3d 1433, 1440 (9th Cir. 1993). "A claim of undue hardship cannot be supported by merely conceivable or hypothetical hardships; instead, it must be supported by *proof* of 'actual imposition on co-workers or disruption of the work routine.'. . . *The magnitude as well as the fact of hardship* must be determined by examination of the facts of each case.'" *Tooley v.Martin-Marietta Corp.*, 648 F.2d 1239, 1243 (9th Cir. 1981) (internal citations omitted) (emphasis added) "Undue hardship means something greater than hardship." *Anderson v. Gen. Dynamics Convair Aerospace Div.*, 589 F.2d 397, 402 (9th Cir. 1978).

Other appellate courts have concurred with the necessity for concrete proof of undue hardship as opposed to claims that are hypothetical or speculative in nature. The Eighth Circuit, recognized that "[a]ny hardship asserted . . . must be 'real' rather than 'speculative,' 'merely conceivable,' or 'hypothetical.'" *Brown v. Polk County, Iowa*, 61 F.3d 650, 655 (8th Cir. 1995) (en banc) (citations omitted). The court later re-emphasized the point, holding that an employer's cost of accommodation "must mean present undue hardship, as distinguished from anticipated or multiplied hardship." *Cook v. Chrysler Corp.*, 981 F.2d 336, 339 (8th Cir. 1992) *quoting Brown v. General Motors Corp.*, 601 F.2d 956, 962 (8th Cir. 1979). Tangible costs of accommodation need not be ascertained with exactitude but must be "present and real." *Cook, 981 F.2d at 339.*

The Sixth Circuit has given similar admonitions regarding the reliance on speculation to prove a claim of hardship.

> [A]n employer does not sustain his burden of proof merely by showing that an accommodation would be bothersome to administer or disruptive of the operating routine. In addition, we are somewhat skeptical of hypothetical hardships that an employer thinks might be caused by an accommodation that never has been put into practice. The employer is on stronger ground when he has attempted various methods of accommodation and can point to hardships that actually resulted.

*Smith v. Pryo Min. Co.,* 827 F.2d 1081, 1085-86 (6th Cir. 1987), *cert. denied,* 485 U.S. 989 (1988), quoting *Draper v. United States Pipe & Foundry Co.*, 527 F.2d 515, 50 (6th Cir. 1975). *See*

---

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Texas Dept. of Com'ty Affairs v. Burdine*, 450 U.S. 248, 253 (1981). A different scheme applies to religious accommodation cases.

*also, Carter v. Oakley, 849 F. Supp. 673 (E.D. Ark. 1993)* (Rejecting as "contrived" and "not convincing" evidence proffered by Defendant in support of its claim that plaintiff's beard, worn in observance of his religious beliefs, resulted in undue hardship).

Abercrombie cannot, as a matter of law, satisfy the Ninth Circuit's undue hardship standard. At most, Abercrombie speculates, without providing specific admissible evidence, that deviations from the Look Policy could tarnish Abercrombie's brand or result in financial hardship for the company.  See Mitchell Decl. Exh. 51 [Order Granting Plaintiff's Motion for Partial Summary Judgment and Denying Defendants' Motion for Summary Judgment, *EEOC v. Abercrombie & Fitch Stores, Inc.*, 5:10-cv-3911-EJD (N.D. Cal. April 9, 2013) ("Abercrombie's executives consider adherence to the Look Policy important and part of their core strategy, yet they are unable to furnish any evidence outlining the degree to which Look Policy compliance affects store performance or brand image.")]; *see also*,  *EEOC v. Alamo Rent-a-Car,* 432 F. Supp. 2d 1006 (D. Ariz. 2006) (granting EEOC's motion for summary judgment and rejecting, as a matter of law, arguments that any deviation to grooming standards to allow its employee to wear a hijab would damage company's image and brand).  Significantly, Defendants have no evidence of harm during the four months that Ms. Khan was employed.  And, although Defendants have granted almost 80 Look Policy exceptions since at least 2005, Defendants cannot produce one bit of objective and admissible evidence proving undue hardship.

### A.    Abercrombie Has No Evidence That Umme-Hani Khan Caused Any Harm

Ms. Khan worked in the Hillsdale Mall store for four months.  Abercrombie cannot point to any evidence that her presence in the store for ten hours a week had any negative impact on its sales, brand or customer experience.  There were no customer complaints or evidence of a diminution in sales connected with Ms. Khan.  (Mitchell Decl Exh. 3 [Chmielewski Dep. 155:12-16]; *see also* discussion, *supra. at* 5.  The public perception of its brand was unaffected by Ms. Khan wearing a hijab to her part-time job in the stockroom.  Furthermore, Abercrombie's claims of hardship are inconsistent with its decision to reinstate her.

### B.    Deviations From The Look Policy Have Not Damaged The Brand

An employer cannot prove undue hardship where, as here, its claims of hardship are belied by its actual practices or proposed accommodations.  In *EEOC v. Townley & Mfg*., the employers

had incorporated their belief in Christ into their business practices, including a requirement that its employees attend weekly devotional services. *EEOC v. Townley & Mfg.*, 859 F.2d 610, 612 (9th Cir. 1988). The *Townley* court declined to credit the employer's undue hardship claim because of prior behavior: the fact that the company had operated its plant for 11 years without requiring attendance at the services "hardly provide[d] an adequate foundation" for its assertion that excusing the plaintiff from attendance would nonetheless have given rise to undue hardship. *Id.* at 616. *Townley*'s reasoning was adopted in *Alamo Rent-a-Car*, where the district court noted that the employer had only begun strictly enforcing its ban on headwear until after the attacks of September 11, 2001. *Alamo*, 432 F. Supp. 2d at 1006; *see also EEOC v. Red Robin Gourmet Burgers, Inc.,* No. C04-1291JLR, 2005 WL 2090677, *4-5 (W.D. Wa. Aug. 29, 2005) (finding employer failed to establish undue hardship, it had allowed the aggrieved employee and others to work with tattoos while also claiming that the tattoos tarnished its public image, and noting absence of evidence that customers had ever complained about the tattoos); *EEOC v. Llona of Hungary*, 885 F. Supp. 1111 (N.D. Ill. 1995), *aff'd in part and rev'd in part,* 108 F.3d 1569 (7th Cir. 1997) (rejecting defendant's undue hardship defense to allowing Jewish employees Saturday off to celebrate Yom Kippur, where employees had been allowed to take Saturdays off for non-religious reasons without harming defendant's business).

Actions taken by an employer *after* it has denied an accommodation request are also relevant to the undue hardship analysis. In *Slater v. Douglas County*, 743 F. Supp. 2d 1188 (D. Or. 2010), a county argued that co-workers would be over-burdened if they had to take over the plaintiff's domestic partnership registration duties. After reviewing evidence of the county's successful processing of registrations after the plaintiff's termination, the court concluded that the county would not have suffered an undue hardship if it had implemented the accommodation. *Id.* at 1190-94 (noting that 40% of the staff successfully processed 70% of the registrations after plaintiff's departure).

In each case cited above, the courts were persuaded by the fact that the employer permitted the very accommodation sought by the plaintiff in other circumstances. Such evidence is equally dispositive here. Abercrombie's claims of undue hardship are fatally undercut by the undisputed

1    fact that since 2006 Defendants granted more than 16 exceptions to the Look Policy for headscarves

2    yet cannot point to any measurable impact on its brand.  Initially, exceptions were only granted in

3    the PTI position, the very position held by Ms. Khan.  In 2010, Abercrombie reversed its previous

4    prohibition and began allowing Models to wear head scarves.  (Mitchell Decl. Exh. 4 [Riley Dep.

5    185:15-186:12, 187:9-188:16].)  Notwithstanding these exceptions and Abercrombie's policy change

6    in the face of its executives' predictions that allowing even one person to wear a headscarf would

7    tarnish the brand, Abercrombie cannot point to any evidence that substantiates its claims.

8           In addition, Abercrombie has historically allowed other exceptions to the Look Policy, the

9    strict enforcement of which, it claims, is integral to its business strategy.  It is undisputed that since

10   at least 2006, Defendants' Human Resources department has granted Look Policy exceptions and

11   allowed: male employees to grow five o'clock shadows; female employees to wear visible jewelry,

12   including a cross; male employees to wear baseball caps and yarmulkes; female employees to wear

13   long skirts that are not sold in its stores or consistent with its "look"; and associates to wear shoes

14   displaying the Nike swoosh in pink and blue.  *See* discussion *supra.*  Defendants cannot have it both

15   ways.  If it made these exceptions to the Look Policy without undue hardship, it could have

16   accommodated Ms. Khan.

17          If Abercrombie's assertion of undue hardship were true, these multiple Look Policy

18   exceptions would reveal some demonstrable detriment to the conduct of its business.  Yet

19   Abercrombie has no proof of a single adverse effect it has actually suffered from any of these

20   exceptions— to its sales, to its "brand," nor to the in-store experience— and thus cannot prove either

21   the "magnitude" or "fact" of hardship as required by the Ninth Circuit.  *Tooley v. Martin-Marietta*

22   *Corp.*, 648 F.2d at 1243.

23          **C.     There is No Link Between The Wearing of Hijabs And An Impact On Sales**

24          Abercrombie admits that it has not tracked or correlated any negative impact on sales with

25   the wearing of a hijab. The Directors of Stores, Regional Managers and District Managers are

26   responsible for gathering data to assess whether associates are complying with the Look Policy.  Yet

27   they do not use the data to measure whether these Look Policy deviations have affected sales.

28   (Mitchell Decl. Exh. 47 [Passalacqua St. Louis Dep. 20:21-21:11, 32:24-34: 3]; Exh. 4 [Riley Dep.

1  189:17-190:11]; Exh. 5 [Riley-Tulsa Dep. 236:7-19].)

2       In *Alamo*, the finding of liability hinged on the dearth of demonstrable financial harm:

3  Alamo assumed that its "carefully cultivated image" would be impacted by its employee's hijab

4  without "supplying any indication of the cost it would have incurred." *Alamo Rent-a-Car,* 432 F.

5  Supp. 2d at 1015.  Abercrombie's arguments mirror those rejected in *Alamo*: like Alamo it is asking

6  the court to assume an inherent business cost when an employee wears a hijab.

7       Defendants' "proof" of undue hardship is nothing more than the personal opinions of its

8  corporate managers of hypothetical harms without any evidentiary support.  Their testimony

9  provides no information as to any tangible present costs of accommodating hijabs or even any facts

10  substantiating their predictions that hardship would occur.  While Defendants describe the undue

11  hardship it may suffer in non-monetary terms such as "damage to the brand" and "hampering the in-

12  store experience," the real claim is that it would be financially harmed if it allowed Ms. Khan to

13  work in its store wearing a headscarf.

14       Abercrombie admits that it assigned no financial value to the undue hardship that it claims.

15  And, to date, Abercrombie has been unable to offer empirical studies or sales figures to support its

16  hardship claims.  Accordingly, Defendants cannot prove that allowing the wearing of headscarves

17  has had or would have a negative impact on its sales.  Where, as here, Defendants operated for

18  several years providing Look Policy accommodations to almost 90 employees and have not shown a

19  demonstrable impact on its business, there is no proof of undue hardship.  *See, e.g., Anderson*, 589

20  F.2d at 402.

21       Although the Ninth Circuit has recognized that undue hardship may not always be measured

22  in dollars, it has nevertheless expressed skepticism that non-quantifiable costs could result in

23  hardship.  *See Townley*, 859 F.2d at 615-16 (concluding that purported business impact of spiritual

24  harm was irrelevant absent proven economic hardship to the company since "[t]he statute . . . posits

25  a gain seeking employer exclusively concerned with preserving and promoting its economic

26  efficiency).

27      **D.**    **Abercrombie's Claims Of Customer Confusion Are Unsupported**

28       Abercrombie has claimed that its brand will be harmed because associates wearing head

1    scarves would engender "customer confusion."  (Mitchell Decl. Exh. 11 [Yoakum Dep. 291:20-

2    292:9].)  Defendants have not produced a shred of evidence showing that customers have been or

3    could be confused by a hijab.  Abercrombie's officials could not cite to any negative comments or

4    complaints about employees wearing hijabs.  (Mitchell Decl. Exh. 11 [Yoakum Dep. 289:23-290:2];

5    Exh. 4 [Riley Dep. 189:12-16, 287:11-15].)  Abercrombie has not attempted to survey its customers

6    to ascertain whether its assumptions are true.  *See* discussion, *supra* at 9-10.  Hypothetical customer

7    confusion does not prove Defendants' affirmative defense.  *See EEOC v. Red Robin*, 2005 WL

8    2090677, *4-5 (W.D. Wash. 2005) (company profile and customer study describing defendant as a

9    family-oriented, kid-friendly brand not probative of undue hardship in the absence of evidence that

10   the displaying of tattoos was inconsistent with Red Robin's brand image);  *EEOC v. Southwestern*

11   *Bell Telephone*, 2007 WL 2891379, *4-5. (E.D. Ark., 2007) (affidavit claiming customer

12   dissatisfaction, damage to its reputation, and the loss of customers for granting employees' religious

13   requests for time off rejected where "[nothing was] said about the nature of the service needs that

14   went unmet or the actual consequence of failing to meet those needs."); *accord Brown v. Polk*

15   *County, Iowa*, 61 F.3d 650, 655 (8th Cir. 1995) (en banc) (citations omitted) (An employer "stands

16   on weak ground when advancing hypothetical hardships in a factual vacuum. 'Undue hardship

17   cannot be proved by assumptions nor by opinions based on hypothetical facts.'").  As in *Red Robin,*

18   *Brown* and *Southwestern Bell*, Abercrombie's claims of harm are simply not real.

19       **E.      Defendants' "Slippery Slope" Argument Has Been Rejected By The Courts**

20       Abercrombie's officials have conceded that past accommodations have not caused a surge of

21   copy cat accommodation requests.  (Mitchell Decl. Exh. 47 [Passalacqua-St.Louis Dep. 63:8-12,

22   67:18-68:18]; Exh. 13 [Fugarino Dep. 182:2-186:4].)  The mere possibility that granting an

23   accommodation would open the door for other employees to seek similar accommodations does not

24   cause undue hardship.  *Opaku-Boateng,* 95 F.3d at 1473-74; *see also, McGinnis v. U.S. Postal*

25   *Service*, 512 F. Supp. 517, 524 (N.D. Cal. 1980) ("[W]hile the possibility of future disruption [by

26   other employees refusing to distribute draft materials] may be relevant to a court's inquiry in

27   evaluating 'undue hardship,' Defendant must present something more than mere speculation about

28   what other employees might do."); *Alamo Rent-a-Car,* 432 F. Supp. 2d at 1016-17 (rejecting

defendant's argument that allowing employee to wear a head covering might affect the efficiency of the company's operations by opening the door for other employees to violate the company's uniform policy); *Red Robin Gourmet Burgers, Inc.*, 2005 WL 2090677, *5 ("The court is unmoved by Red Robin's final, "slippery slope" argument that allowing [plaintiff] to work with visible tattoos would force it to allow whatever tattoos, facial piercings or other displays of religious information an employee might claim.).

### F.      Negligible Claims Cannot Prove Undue Hardship

Employers cannot prove undue hardship where the number of employees seeking accommodation is negligible.  Seventh Day Adventist employees objected to paying union dues in *Burns v. Southern Pacific Transp. Co.*, 589 F.2d 403, 407 (9th Cir. 1978).  The union argued that the loss of $19 per month in dues would cause financial hardship.  The Ninth Circuit rejected the argument: since only three of 300 employees required accommodation, the financial impact was *de minimis*.  *Id.*  Abercrombie has employed as many as 80,000 part-time employees and provided accommodations for only 90 of them.  The fact that Abercrombie has only been called upon to provide statutorily mandated accommodations based on religion or disability for less than one third of one percent (0.00112) of its employees is telling.  Accommodating such a miniscule number of employees could not possibly create even a *de minimis* hardship on Defendants' business operations.

Despite having thousands of stores and nearly one-hundred thousand employees, none of Abercrombie's business records, either before or after Ms. Khan worked for Abercrombie, reveal any evidence of hardship.  Abercrombie has failed to produce even one document, survey, customer complaint, sales report or financial statement linking an employee's non-compliance with the Look Policy with an adverse impact on its brand or bottom line, or as the root cause of some sort of customer confusion.  Even viewing the facts in the light most favorable to Abercrombie, there is no proof that permitting Ms. Khan to wear a hijab would cause an undue hardship.  Summary judgment must be entered for Plaintiffs on their Title VII religious accommodation claims.

### V.      DEFENDANTS ALSO VIOLATED CALIFORNIA LAW BY FAILING TO GRANT KHAN A RELIGIOUS ACCOMODATION.

The elements of the *prima facie* case under FEHA for failure to provide a religious

1    accommodation are similar to those under Title VII.  *See FEHC v. Gemini Aluminum Corp.*, 22

2    Cal.App.4th 1004, 1011 (2004) (stating that employee must establish that she: (1) sincerely held a

3    religious belief; (2) the employer was aware of that belief; (3) and the belief conflicted with an

4    employment requirement).  As detailed above, *supra* at 12, Defendants are unable to put forward any

5    evidence to challenge Ms. Khan's *prima facie* case.

6          Once an employee has made out a *prima facie* case and the employer fails to initiate an

7    accommodation for the religious practice, the burden is then on the employer to prove it will incur an

8    undue hardship if it accommodates the belief.  *Soldinger v. Northwest Airlines, Inc.*, 51 Cal. App.

9    4th 345, 371 (1996).  Though a handful of state courts have looked to Title VII jurisprudence for

10   guidance assessing undue hardship, *see, e.g.*, *Soldinger*, 51 Cal App. 4th at 371, FEHA has long

11   defined "undue hardship" more stringently than Title VII.  *See* Cal. Gov't Code §12926(t) (defining

12   undue hardship as an "*an action requiring significant difficulty or expense*" when considered in light

13   of five enumerated factors)[11] (emphasis added).  Further, the Fair Employment and Housing

14   Commission ("FEHC") promulgated religious accommodation regulations setting forth undue

15   hardship factors similar to those enumerated in FEHA.  *See* Cal. Code. Regs. tit. 2, §7293.3(b)(1)-(7)

16   The FEHC's regulations also elucidate that an employer's "[d]ress standards or requirements should

17   be flexible enough to take into account religious practices."  *See id.* at §7293.3(c)(2); *see also*

18   *Colmenares v. Braemar Country Club, Inc.*, 29 Cal.4th 1019, 1029 (2003) (stating that California

19   courts "give substantial weight to the FEHC's construction of the statutes under which it operates").

20         Here, Abercrombie has failed to put forward sufficient evidence to prove that allowing Ms.

21   Khan to wear her hijab at work "required significant difficulty or expense."  Cal. Gov't Code

22   §12926(t).  In light of the relevant factors, they are unable to do so.  The needed accommodation –

23

---

24   [11]  Those factors are:  (1) the nature and cost of the accommodation needed; 2) the overall financial
25   resources of the facilities involved in the provision of the reasonable accommodations, the number
     of persons employed at the facility, and the effect on expenses and resources or the impact otherwise
26   of these accommodations upon the operation of the facility; (3) the overall financial resources of the
     covered entity, the overall size of the business of a covered entity with respect to the number of
27   employees, and the number, type, and location of its facilities; (4) the type of operations, including
     the composition, structure, and functions of the workforce of the entity; and (5) the geographic
28   separateness, administrative, or fiscal relationship of the facility or facilities.  Cal. Gov't Code §
     12926(t).

1   allowing Ms. Khan to continue wearing her hijab while she worked – would have imposed no cost

2   on Defendants.  *See id.* at §12926(t)(1); Mitchell Decl. Exh. 5 [Riley-Tulsa Dep. 236:7-19]; Exh. 47

3   [Passalacqua-St.Louis Dep. 20:21-21:11, 32:24-34:3]; Exh. 4 [Riley Dep. 189:17-190:11]; Exh. 12

4   [Passalacqua Dep. 96:16-23, 191:22-192:22]; Exh. 11 [Yoakum Dep. 260:20-261:19].  Additionally,

5   Defendants' overall financial resources, as well as the number and locations of its stores and

6   employees reveal the minimal impact the needed accommodation would have had.  *See* Cal. Gov't

7   Code §12926(t)(3); *supra* I.D.  Moreover, Defendants are unable to show that the needed

8   accommodation had ever in the past or would ever going forward adversely impact their operations

9   either at the Hillsdale location or nationwide.  *See id* at §12926(t)(2); Mitchell Decl. Exh. 5 [Riley-

10  Tulsa Dep. 236:7-19]; Exh. 47 [Passalacqua-St.Louis Dep. 20:21-21:11, 32:24-34:3]; Exh. 4 [Riley

11  Dep. 189:17-190:11]; Exh. 12 [Passalacqua Dep. 96:16-23, 191:22-192:22]; Exh. 11 [Yoakum Dep.

12  260:20-261:19].  Indeed, because Defendants had granted similar accommodations to several of its

13  employees, in particular those in the same PTI position as Ms. Khan, Defendants cannot show that

14  any of their operations or workforce functions would have been impeded by allowing Ms. Khan to

15  wear her hijab.  *See* Cal. Gov't Code §12926(t)(4); Khan Decl ¶ 5; Mitchell Decl. Exh. 11 [Yoakum

16  Dep. Ex. 10 at AF00188]; Exh. 4 [Riley Dep 189:17-190:11].  Finally, the centralization of

17  Defendants' HR Dept., which handles all requests for such religious accommodations like the one at

18  issue here, also augers in favor of Ms. Khan because Defendants cannot demonstrate that geographic

19  separateness of their facilities will result in any kind of administrative burden.  *See* Cal. Gov't Code

20  §12926(t)(5); Mitchell Decl. Exh. 4 [Riley Dep. 43:9-21, 46:23-47:18, 150:12-151:3].

21          Because FEHA's plain text has long embraced a more stringent standard than the one

22  embraced by federal courts regarding undue hardship – a standard mirrored in regulations

23  promulgated by the FEHC – and because Abercrombie cannot advance evidence to show that

24  accommodating Ms. Khan would require a significant difficulty or expense, this Court should grant

25  Ms. Khan's motion for summary judgment with respect to her FEHA religious accommodation.

26  Finally, even if this Court should conclude that the FEHA standard is identical to Title VII, for the

27  reasons *supra* at section IV, Ms. Khan is entitled to summary judgment on her FEHA religious

28  accommodation claim.

PLAINTIFFS EEOC'S & KHAN'S MOTION FOR
PARTIAL SUMMARY JUDGMENT

## VI.    PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON DEFENDANTS' COMMERCIAL RIGHT OF FREE SPEECH DEFENSE

Defendants' Tenth Affirmative Defense states that "[s]ome or all of the claims asserted fail because they infringe upon Defendants' right to commercial free speech, under the First Amendment to the United States Constitution."  As a threshold matter, the defense fails because PTI appearance is not protected by the First Amendment.  Should the Court conclude otherwise, and presuming Defendants' concern to be that any accommodation order obtained by the EEOC would impermissibly detract from their ability to use employees to advertise the Abercrombie brand or "look," Plaintiffs are still entitled to summary judgment.

### A.    PTI Appearance Is Not Commercial Speech

PTI appearance is not constitutionally protected speech.  The mere fact that Abercrombie claims that PTI appearance is "in-store" advertising does not compel the conclusion that it is commercial speech.  In *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 66 (1983), the Supreme Court held that the combination of *all* of the following three characteristics would support a finding of commercial speech: (1) it is an advertisement of some form, (2) it refers to a specific product, and (3) the speaker has an economic motivation for the speech.  *Id.* at 67.

In this case, none of the *Bolger* characteristics apply to PTI appearance.  PTIs are stock room employees responsible for "taking [ ] shipment, folding it, [and] placing it on the [sales] floor." (Mitchell Decl. ¶ __; Exh. 11 [Yoakum Dep. 59:16-60:9].)  Because a PTIs' job duties "do not actually include serving as living advertisements for the Abercrombie brand. . . PTIs' appearances simply do not constitute 'advertisements.'"  (Mitchell Decl. Exh. 51 [Order in *EEOC v. Abercrombie & Fitch Stores, Inc.*, No. 10-3911 (N.D. Cal. April 9, 2013) (Dkt. No. 106)].)  While PTIs are expected to comply with Abercrombie's Look Policy, they are not required to wear clothing sold within the store and, in fact, are allowed to wear competitors' clothes to work.  (Mitchell Decl. ¶__; Exh. 4 [Riley Dep. 136:1-6, 202:4-8].)  Since none of the *Bolger* characteristics are present, the appearance of PTIs cannot be considered commercial speech.

### B.    Even if PTI Appearance is Commercial Speech, Abercrombie's First Amendment rights are not violated.

The Constitution accords a lesser protection to commercial speech than to other

1  constitutionally guaranteed expressions[12].  *Central Hudson Gas & Electric Corp. v. Public Service*

2  *Comm'n of New York*, 447 U.S. 557, 562-63 (1980) (citations omitted).  There is a "'commonsense'

3  distinction between speech proposing a commercial transaction, which occurs in an area traditionally

4  subject to government regulation, and other varieties of speech."  *Id*. (citations omitted).  *Central*

5  *Hudson* sets out a four-part test for determining whether commercial speech may properly be

6  regulated by the government:  (1) the speech must concern lawful activity and not be misleading; (2)

7  the asserted governmental interest in regulating the speech must be substantial; (3) the regulation

8  must directly advance the governmental interest asserted; and (4) the regulation must not be more

9  extensive than is necessary to serve that interest.  *Id*. at 564; *see also Valle Del Sol, Inc., v. Whiting*,

10  709 F.3d 808, 820-21 (9th Cir. 2013)(following *Central Hudson*'s analysis with respect to

11  commercial speech).

12          Though Defendants' "speech" satisfies the first element of the *Central Hudson* analysis, the

13  government's interest in enforcing civil rights is indisputably substantial.  Accepting for the sake of

14  argument that Abercrombie's employees advertise its clothes, Plaintiffs do not dispute that an

15  employer's use of its employees to advertise its "brand" is otherwise lawful and not misleading.  It is

16  likewise beyond dispute that the government has a "substantial," indeed *overriding*, interest in

17  guaranteeing the fundamental civil rights of its citizens.  There is no imaginable set of

18  circumstances, let alone those presented here, in which Title VII's "central statutory purposes of

19  eradicating discrimination throughout the economy and making persons whole for injuries suffered

20  through past discrimination," *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 421 (1975), could be

21  characterized as less than "substantial."

22

23  _____

[12]  Defendants argue that the EEOC seeks to "compel[ ] Abercrombie to advertise a fashion style that

24  is inconsistent with its own."  (Docket No. 80 [Defendants' Response to Plaintiffs' Request for Pre-
Filing Conference].)  An employee's wearing of a hijab would not constitute "expressive conduct,"

25  as Defendants presume.  For conduct to be communicative, there must be an intent to convey a
particularized message, and that message must be likely to be understood by those viewing it.

26  *Spence v. Washington*, 418 U.S. 405, 410-11 (1974).  Those conditions are absent here, as
Ms. Khan's wearing of a hijab had no communicative purpose, only a personal religious

27  significance.  (Mitchell Decl. Exh. 1 [Khan Dep. 51:5-18].)  *See also Zalewska v. County of Sullivan,
New York*, 316 F.3d 314, 320-21 (2d Cir. 2003) (finding that a person's choice of dress or

28  appearance typically does not possess the communicative elements necessary to be considered
speech-like conduct protected by the First Amendment).

1    The public interest is advanced by requiring Defendants to accommodate an individual's

2    belief that she must wear a hijab.  Plaintiffs seek an order requiring Defendants to reasonably

3    accommodate present and future employees in Ms. Khan's position whose sincere religious beliefs

4    similarly require them to wear a hijab, consistent with the mandates of Title VII.  Such injunctive

5    relief would directly advance the paramount federal policy against employment discrimination in

6    that it would simply require Defendants to comply with their obligation under the law to reasonably

7    accommodate the sincere religious beliefs of their employees, and to do so in the future – nothing

8    more.

9    The relief requested is no more extensive than needed to achieve the public interest.  The

10    restriction on Defendants' commercial speech that Plaintiffs seek here – the reasonable

11    accommodation of PTI applicants or employees who are religiously mandated to wear a hijab – are

12    *de minimis*.  As noted above, requiring Defendants to follow the law by reasonably accommodating

13    employees who wear a hijab for religious reasons does no more than the law commands.  And as a

14    practical matter, from December 2008 to August 2012, only 12 employees out of the approximately

15    80,000 it employs worldwide have requested and been granted permission to wear hijabs.  The

16    paucity of requests is indicative of the insignificant impact such accommodations would have upon

17    Defendants' ability to project the image they wish to convey through the Look Policy.

18    **VII.    CONCLUSION**

19    Abercrombie's defenses fail as a matter of law.  The EEOC is entitled to partial summary

20    judgment.

21    Respectfully submitted,

22    Dated:  April 11, 2013          By:   */s/ Marcia M. Mitchell*
                                            Marcia M. Mitchell
23                                          US EQUAL EMPLOYMENT OPPORTUNITY
                                            COMMISSION
24                                          *Attorneys for Plaintiff EEOC*

25
      Dated:  April 11, 2013          By:   */s/ Araceli Martinez-Olguin*
26                                          Araceli Martínez-Olguín
                                            LEGAL AID SOCIETY-EMPLOYMENT
27                                          LAW CENTER
                                            *Attorneys for Plaintiff-Intervenor UMME-HANI*
28                                          *KHAN*