UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,<br><br>          Plaintiff,<br><br>and<br><br>UMME-HANI KHAN,<br><br>          Plaintiff-Intervenor,<br><br>     vs.<br><br>ABERCROMBIE & FITCH STORES, INC., d/b/a HOLLISTER CO., HOLLISTER CO. CALIFORNIA, LLC,<br><br>          Defendants. | Case No.: 11-cv-03162-YGR<br><br>**ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING DEFENDANTS' CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT** |

Pending before the Court are cross-motions for partial summary judgment. Plaintiff U.S. Equal Employment Opportunity Commission ("EEOC") filed this action against Defendants[1] on June 27, 2011 alleging discrimination on the basis of religion in violation of Title VII, 42 U.S.C. section 2000e-2(a)(1). (Dkt. No. 1.) On September 9, 2011, Plaintiff-Intervenor Umme-Hani Khan ("Khan") filed a Complaint in Intervention for Damages and Injunctive and Declaratory Relief for Employment Discrimination.[2] (Dkt. No. 28.)

---

[1] Defendants are Abercrombie & Fitch Stores, Inc., d/b/a Hollister, Hollister Co. California, LLC. Hereafter, the Court will refer to Defendants as "Abercrombie."

[2] Khan alleges four claims: (1) Unlawful Discrimination and Discharge on the Basis of Religion in Violation of Title VII, 42 U.S.C. section 2000e-2(a)(1); (2) Unlawful Failure to Accommodate Religious Beliefs in Violation of Title VII, 42 U.S.C. section 2000e(j); (3) Unlawful Discrimination

The EEOC and Khan (collectively, "Plaintiffs") have jointly filed a Motion for Partial Summary Judgment ("Motion"), seeking judgment in their favor as to (i) liability on the claims regarding religious accommodation and (ii) Abercrombie's sixth, eighth, and tenth affirmative defenses based on failure to exhaust administrative remedies, undue hardship, and infringement upon Abercrombie's right to commercial free speech, respectively. (Dkt. No. 97.) Abercrombie opposes Plaintiffs' Motion, and filed a Cross-Motion for Partial Summary Judgment ("Cross-Motion") seeking (i) dismissal of the EEOC's claims on the grounds the EEOC failed to conciliate in good faith and (ii) summary judgment on Plaintiffs' claims for injunctive relief and punitive damages. (Dkt. No. 103.) On June 18, 2013, the Court held oral argument on the pending motions. (Dkt. No. 117.)[3]

Having carefully considered the papers submitted and the pleadings in this action, the arguments of counsel, and for the reasons set forth below, the Court hereby **GRANTS** Plaintiffs' Motion for Partial Summary Judgment and **DENIES** Defendants' Cross-Motion for Partial Summary Judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Abercrombie and the Look Policy

Defendant Abercrombie & Fitch, Inc. operates retail stores across the country under the brand names Abercrombie & Fitch, Hollister Co., abercrombie kids and Gilly Hicks. (UMF No. 2.)[4] Employees who work in both the stock room and on the sales floor to restock merchandise are titled "Impact" or Part-Time Impact ("PTI") employees (sometimes referred to as associates). (UMF No. 4; Declaration of Marcia Mitchell in Support of Plaintiffs EEOC's and Khan's Motion for Partial

---

and Discharge on the Basis of Religion in Violation of the California Fair Employment and Housing Act ("FEHA"), Cal. Gov't Code section 12940; and (4) Unlawful Failure to Accommodate Religious Beliefs in Violation of FEHA, Cal. Gov't Code section 12940.

[3] The parties attempted to provide the Court with supplemental authority and/or additional evidence and argument after the hearing on the motions. The Court struck those documents from the record. (Dkt. No. 119.)

[4] "UMF" refers to the Parties' Joint Statement of Undisputed Material Facts. (Dkt. No. 102.) Unless otherwise noted, the references to the material facts include the underlying evidence referenced in support of the fact. Although the parties did not number the UMFs, the Court will refer to the facts in numerical order.

United States District Court

Northern District of California

Summary Judgment ["Mitchell Motion Decl." (Dkt. No. 98)], Ex. 11 [Videotaped Deposition of Amy Yoakum ("Yoakum Dep.")] 59:9–24[5].)  Abercrombie also employs "Models" who work on the sales floor.  (UMF No. 3; Mitchell Motion Decl., Ex. 7 [Deposition of Chad W. Moorefield ("Moorefield Dep."] 50:8–51:14[6].)

Abercrombie maintains a "Look Policy" which was effective at all times relevant to this case. (UMF No. 5.)  The Look Policy is a grooming policy that gives employees guidelines regarding their appearance and the clothing they are expected to wear while at work.  (Mitchell Motion Decl., Ex. 4 [Deposition of Deon Riley, Ph.D. ("Riley 3/14/12 Dep.")] 135:16–25.)  The Look Policy requires employees to wear clothes similar to those sold in Abercrombie stores, though they are not required to wear Abercrombie clothing.  (*Id.* 202:4–8.)[7]  In 2010, the Look Policy prohibited employees from wearing headwear.  (Mitchell Motion Decl., Ex. 6; Yoakum Dep. 255:19–25; Clark Decl., Ex. E. [30(b)(6) Deposition of Christopher Fugarino ("Fugarino Dep.")] at Ex. 26 at 29–30.)

In addition to the Look Policy, Abercrombie's marketing strategy seeks to create an "in-store experience" for customers that conveys the principal elements and personality of each Abercrombie brand.  (Mitchell Motion Decl., Ex. 2 [Abercrombie & Fitch Co., Annual Report (Form 10-K) (January 30, 2010)] at 2.)  The in-store experience is the "primary vehicle for communicating the spirit of each brand."  (*Id.*)  "[S]ales associates . . . reinforce the aspirational lifestyles represented by the brands" and "are a central element in creating the atmosphere of the stores."  (*Id.*)  Abercrombie

---

[5] Additional excerpts of the Yoakum Dep. were attached to the Declaration of Daniel J. Clark in Support of Defendants' Opposition to Plaintiffs' Partial Motion for Summary Judgment and Cross-Motion for Partial Summary Judgment ["Clark Decl." (Dkt. No. 104)], Ex. F and the Declaration of Marcia Mitchell in Support of Plaintiffs' Reply to Defendants' Combined Opposition to Plaintiffs' Motion for Partial Summary Judgment and Cross-Motion for Partial Summary Judgment ["Mitchell Reply Decl." (Dkt. No. 108)], Ex. 21.

[6] Additional excerpts of the Moorefield Dep. were attached to the Mitchell Reply Decl., Ex. 26.

[7] The Look Policy also requires employees to wear specific types of shoes (flip flops, Converse sneakers, or Vans sneakers), prohibits facial hair and clothing with obvious logos from non-Abercrombie stores, and restricts the type of jewelry may be worn.  (Riley 3/14/12 Dep. 136:1–137:9,140:17–141:3, 204:2–11.)

United States District Court
Northern District of California

considers the in-store experience to be its main form of marketing, although it also engages customers through social media and mobile commerce.  (*Id.* at 3.)

All store employees, including Impact and PTI employees, are required to comply with the Look Policy.  (UMF No. 6.)  Applicants for employment are informed of the Look Policy during the interview process.  (UMF No. 7.)  New employees sign an acknowledgement of the Look Policy when they are hired, and the Look Policy also appears in the Abercrombie employee handbook.  (UMF No. 8.)

### B.    Khan's Employment with Abercrombie

Plaintiff Umme-Hani Khan is Muslim.  (UMF No. 1.)  Khan believes that Islam dictates that she wear clothes that she considers modest.  (Mitchell Motion Decl., Ex. 1 [Videotaped Deposition of Umme-Hani Khan ("Khan Dep.")] 23:7–15.)[8]  She further believes that Islam requires her to wear a head scarf, also known as a hijab, when in public or in the presence of men who are not immediate family members.  (*Id.* 17:13–16, 22:7–14, 46:16–48:3.)  At the time of her hire, Khan had fully adopted the practice of wearing a hijab in public or when in the presence of males outside of her immediate family.  (*Id.* 50:18–24.)  She wore a headscarf when she was interviewed for her position, and knew that Abercrombie did not sell headscarves.  (UMF Nos. 10 & 11.)  When hired, Khan acknowledged the Look Policy and agreed to abide by it.  (Khan Dep. 79:15–80:10, 89:8–11.)

In October 2009, Khan began work as a PTI employee at a Hollister store in the Hillsdale Shopping Center in San Mateo.  (UMF No. 9.)  As a PTI employee, she was responsible for ensuring that merchandise was prepared for the sales floor, which included folding clothes received in shipments, placing those items on the floor, and replacing those items as clothes are sold.  (Yoakum Dep. 59:9–24; Khan Dep. 76:6–13 (also ensured shipments were complete); Moorefield Dep. 34:16–23 (impact associate's job is "to process shipment and fill the sales floor").)  Khan's duties were performed primarily in the stockroom.  (Khan Dep. 77:5–8; Yoakum Dep. 60:5–9.)  While the unpacking and folding of items would take place in stockrooms, Khan would restock clothes on the floor anywhere from one to four times per shift.  (Khan Dep. 77:9–20.)

---

[8] Additional excerpts of the Khan Dep. were attached to the Clark Decl., Ex. J.

Khan wore her headscarf at work from October 2009 until her termination in February 2010. She regularly wore long-sleeved shirts and jeans purchased at Hollister along with a pair of flip-flops to work.  (Plaintiff-Intervenor Umme-Hani Khan's Declaration in Support of Plaintiffs' Motion for Partial Summary Judgment [Dkt. No. 99] ¶ 4.)  Local supervisors permitted Khan to wear her headscarf so long as it matched company colors.  (Khan Dep. 69:5–23.)  During that time, the store managers never informed her she was not complying with the Look Policy.  (*Id.* 84:16-21.)

On or around February 10, 2010, during a regularly scheduled store visit to the Hillsdale store, District Manager Adam Chmielewski noticed that Khan was not in compliance with the Look Policy. (UMF No. 12.)  When he saw Khan on that occasion, he did not know that she had been employed by Abercrombie for several months.  (UMF No. 13.)  Chmielewski contacted Amy Yoakum, Senior Manager of Human Resources, for guidance on how to address the situation.  (UMF No. 14.)   On February 15, 2010, Yoakum discussed the situation with Chmielewski and Khan over the phone. (UMF No. 15.)  During that phone conversation, Yoakum told Khan that her headscarf was in violation of the company's Look Policy and asked her if she could take it off.  (UMF No. 16.)  Khan told Yoakum that she could not take the headscarf off because it was part of her religion.  (UMF No. 17.)  Yoakum informed Khan that Abercrombie would suspend her shifts but continue to pay her while they investigated.  (Yoakum Dep. 63:5–15.)

Khan returned to the store on February 22, 2010 for a second phone conversation with Yoakum and Chmielewski.  (UMF No. 18.)  Prior to the phone call, Abercrombie prepared Khan's final paycard (equivalent to a paycheck).  (Yoakum Dep. 101:23–103:3.)  During the call, Yoakum asked again whether Khan could remove her headscarf while she was on the clock.  (UMF No. 19.) Khan responded, again, that she could not do so because of her religious beliefs.  (UMF No. 20.) Yoakum terminated Khan's employment for non-compliance with the company's Look Policy.  (UMF Nos. 21 & 22.)  Khan's refusal to remove her hijab was the sole reason for her suspension and termination.  (Mitchell Motion Decl., Ex. 9; Yoakum Dep. 61:11–23, 62:24–64:19, 99:13–18.)

Eleven days later, on March 5, 2010, Abercrombie extended Khan an unconditional offer of reinstatement with the accommodation of being allowed to wear her headscarf to work.  (UMF No. 23.)  Khan declined the offer of reinstatement.  (Khan Dep. 140:6–8.)

**C.      Post-Termination Conduct Between EEOC and Abercrombie**

Khan filed a Charge of Discrimination with the EEOC and DFEH on March 1, 2010. (Declaration of Michael Baldonado in Support of Plaintiff's Motion for Partial Summary Judgment ["Baldonado Decl." (Dkt. No. 100)], Ex. 1.)  On March 8, 2010, the EEOC notified Abercrombie of the charge.  (Baldonado Decl., Ex. 2.)

In 2010, the EEOC was involved in two other cases with Abercrombie: (1) *EEOC v. Abercrombie & Fitch Stores, Inc., d/b/a Abercrombie Kids*, No. 10-cv-03911-EJD (N.D. Cal.) and (2) *EEOC v. Abercrombie & Fitch Stores, Inc., d/b/a Abercrombie Kids*, No. 09-cv-602-GKF-FHM (N.D. Okla.).  In the Northern District of California action (hereafter, "*Banafa*"), the EEOC alleged that Abercrombie refused to hire Halla Banafa as a PTI associate because she wore a hijab.  (Mitchell Reply Decl. ¶ 4.)  In the Northern District of Oklahoma case (hereafter, "*Elauf*"), the EEOC alleged that Abercrombie refused to hire Samantha Elauf into a Model position because she wore a hijab.  (*Id.* ¶ 5.)  On or about September 16, 2010, the EEOC informed Abercrombie's counsel that it would be interested in jointly negotiating a settlement of the *Banafa* and *Elauf* cases.  (*Id.* ¶¶ 7–8 & Ex. 2.)

On September 24, 2010, the EEOC sent Abercrombie a "Determination" letter stating that there was reasonable cause to believe it had discriminated against Khan in violation of Title VII. (Baldonado Decl., Ex. 3; Mitchell Reply Decl. ¶ 9; Declaration of Stacia Marie Jones, Esq. [Dkt. No. 104-14] ¶ 4.)  In the Determination, the EEOC invited Abercrombie to conciliate the charge informally.  Also on September 24, the EEOC sent a conciliation offer letter to Abercrombie recommending compensatory damages and other forms of non-monetary relief, to which Abercrombie replied with a counteroffer.  (Clark Decl., Ex. O.)

The EEOC and Abercrombie jointly discussed settlement of *Banafa* and *Elauf* in October 2010.  (Mitchell Reply Decl., Ex. 3.)  Marcia Mitchell, the attorney assigned to negotiate with Abercrombie in *Banafa* and in the instant action (which was then in conciliation) understood that the parties were pursuing a global settlement of all three matters.  (*Id.* ¶¶ 10 & 12.)  The discussions in October 2010 included exchanging draft consent decrees containing terms to resolve all three matters. (*Id.* ¶ 14.)  Negotiations regarding the consent decrees continued into November 2010.  (*Id.* ¶¶ 16–23

1   & Exs. 4–11.)  On December 10, 2010, the parties participated in a settlement conference in *Elauf*

2   before a magistrate judge, but the case did not settle.  (*Id.* ¶ 25.)

3          On December 17, 2010, the EEOC presented Abercrombie with proposed language to adopt as

4   company policy.  (Clark Decl., Ex. M [Deposition of Hussam Ayloush Pursuant to Federal Rule

5   30(b)(6) on Behalf of CAIR-California] at Ex. 48.)[9]  The EEOC stated that "[i]f Hollister is willing to

6   incorporate the above language in its policies, then the EEOC would be happy to continue with

7   conciliation efforts on issues of money and other injunctive relief."  (*Id.*)  In addition, the EEOC

8   "included the new requests from Charging Party [Khan] and her counsel."  (*Id.*)  Abercrombie

9   rejected the conciliation demand on December 20, 2010 because the EEOC's proposed language

10  mandated that all employees be allowed to wear headscarves in the future and did not permit

11  consideration on a case-by-case basis.  (*Id.*)  The rejection email from Abercrombie concluded with

12  the statement: "To the extent the EEOC continues to force us to do more than is required under the

13  law and in the EEOC's own guidance, this matter will not resolve."  (*Id.*)

14         On January 6, 2011, the EEOC emailed CAIR, who was representing Khan, and informed

15  CAIR that its intent was to "fail conciliation" with Abercrombie.  (*Id.* at Ex. 48 (also seeking Khan

16  and CAIR's input on failing conciliation).)  On January 11, 2011, CAIR informed the EEOC that

17  Khan did not object to failing conciliation.  (*Id.* at Ex. 50.)  On January 18, 2011, the EEOC notified

18  Abercrombie that it had "determined that efforts to conciliate the[] cases as required by [its]

19  procedures and policies have been unsuccessful."  (Baldonado Decl., Ex. 4.)  A letter was also sent to

20  CAIR and Khan informing them that the EEOC would next determine whether to file a civil action.

21  (Clark Decl., Ex. M at Ex. 52.)

22         In March 2011, the parties re-engaged in settlement negotiations for all three matters.

23  (Mitchell Reply Decl. ¶ 28 & Ex. 12.)  Emails and/or conference calls occurred on March 7, 8, 9, 14,

24  15, 21, 23, 30 and 31, wherein monetary and non-monetary demands were made on behalf of Khan.

25  (*Id.* ¶¶ 27–36 & Exs. 12–16.)  Further settlement negotiations occurred via email and conferences on

26  April 7, 11, 12, 19, 20 and 27.  (*Id.* ¶¶ 37–43 & Exs. 17–20.)

27  _____

28  [9] CAIR-California is the Council on American-Islamic Relations, California.

United States District Court

Northern District of California

On May 13, 2011, the EEOC requested a status update from Abercrombie.  (*Id.* ¶ 44 & Ex. 20.)  Abercrombie rejected the demands made by the EEOC.  (*Id.* ¶ 45.)  The EEOC informed Abercrombie that it had been "holding off on filing the lawsuit with the hope of resolving all of the cases at once" and that if there was nothing further to discuss, the EEOC would "proceed with filing Ms. Khan's case."  (*Id.*, Ex. 20.)  Abercrombie responded on May 19, 2011 that it appeared the parties were at an impasse.  (*Id.*)  The EEOC filed the instant action on June 27, 2011.  (Dkt. No. 1.)

## II.   LEGAL STANDARD

Summary judgment is appropriate when no genuine dispute as to any material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).  A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and of identifying those portions of the pleadings, depositions, discovery responses, and affidavits that demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Material facts are those that might affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Id.* at 247–48 (dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party).

Where the moving party will have the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party.  *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).  On an issue where the non-moving party will bear the burden of proof at trial, the moving party can prevail merely by pointing out to the district court that the non-moving party lacks evidence to support its case.  *Id.*  If the moving party meets its initial burden, the opposing party must then set out "specific facts" showing a genuine issue for trial in order to defeat the motion.  *Id.* (quoting *Anderson*, 477 U.S. at 250).  The opposing party's evidence must be more than "merely colorable" but must be "significantly probative."  *Id.* at 249–50.  Further, that party may not rest upon mere allegations or denials of the adverse party's evidence, but instead must produce admissible evidence that shows a genuine issue of material fact exists for trial.

United States District Court
Northern District of California

8

*Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102–03 (9th Cir. 2000); *Nelson v. Pima Cmty. College Dist.*, 83 F.3d 1075, 1081–1082 (9th Cir. 1996) ("mere allegation and speculation do not create a factual dispute"); *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 922 (9th Cir. 2001) ("conclusory allegations unsupported by factual data are insufficient to defeat [defendants'] summary judgment motion").

When deciding a summary judgment motion, a court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in its favor. *Anderson*, 477 U.S. at 255; *Hunt v. City of Los Angeles*, 638 F.3d 703, 709 (9th Cir. 2011). However, in determining whether to grant or deny summary judgment, it is not a court's task "to scour the record in search of a genuine issue of triable fact." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (internal quotations omitted). Rather, a court is entitled to "rely on the nonmoving party to identify with reasonable particularity the evidence that precludes summary judgment." *See id.*; *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001) ("The district court need not examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the opposing papers with adequate references so that it could conveniently be found.")

## III.   REQUIREMENT OF CONCILIATION

As a threshold requirement, the EEOC must satisfy four conditions precedent prior to filing suit. It must: (1) receive a timely charge of discrimination and provide notice to the employer thereof; (2) conduct an investigation; (3) determine that reasonable cause exists to believe that discrimination has occurred; and (4) attempt to eliminate any alleged unlawful employment practice by informal methods of conference, conciliation, and persuasion. *EEOC v. Pierce Packing Co*., 669 F.2d 605, 607 (9th Cir. 1982). Plaintiffs argue that the EEOC satisfied these requirements. Abercrombie disagrees as to the last element only. If all elements are not met, the entire lawsuit may be dismissed or stayed at the Court's discretion. Accordingly, the Court addresses this issue first.

The issue at hand concerns the fourth condition precedent. The EEOC emphasizes that it attempted to conciliate Khan's charge from September 2010 to May 2011, prior to initiating the lawsuit. Because these efforts were unsuccessful, the EEOC elected to file suit. *See* 42 U.S.C. § 2000e-5(f)(1) (EEOC is authorized to file suit thirty days after the filing of a charge if "the

United States District Court
Northern District of California

9

Commission has been unable to secure from [defendant] a conciliation agreement acceptable to the Commission.")  Khan thereafter intervened in this action to vindicate her rights under Title VII and FEHA.  Abercrombie argues that the conciliation efforts were required to be done in good faith and EEOC failed to do so.

The proper standard for reviewing whether the EEOC conciliated in good faith varies amongst the circuits.  Under a "highly deferential" approach, the "form and substance of the EEOC's conciliation proposals are within the discretion of the EEOC and are not subject to judicial second-guessing."  *EEOC v. Timeless Investments, Inc.*, 734 F. Supp. 2d 1035, 1052 (E.D. Cal. 2010) (quoting *EEOC v. Keco Indus., Inc.,* 748 F.2d 1097, 1102 (6th Cir.1984)).  Under a stricter approach, "the EEOC must meet three requirements to fulfill its conciliation duty: (1) outline to the employer the reasonable cause for its belief that the [statute] has been violated; (2) offer an opportunity for voluntary compliance; and (3) respond in a reasonable and flexible manner to the reasonable attitudes of the employer."  *Timeless Investments*, 734 F. Supp. 2d at 1052 (citing *EEOC v. Asplundh Tree Expert Co.,* 340 F.3d 1256, 1259 (11th Cir. 2003); *EEOC v. Johnson & Higgins, Inc.,* 91 F.3d 1529, 1534 (2d Cir. 1996); *EEOC v. Klingler Electric Corp.,* 636 F.2d 104, 107 (5th Cir. 1981)).  The Ninth Circuit has not adopted a standard.  As set forth herein, the Court need not determine which standard applies in the pending Motions because the Court finds dismissal is not warranted under either standard.

The proffered evidence of the EEOC's purported lack of good faith include: (1) providing exclusive updates or advanced notice to Khan and CAIR; (2) providing bcc's to CAIR on all communications to and from Abercrombie; (3) failing to "respond to the reasonable attitudes of the employer" and demanding an injunction that would not permit it to make determinations on a case-by-case basis, as permitted by law; (4) abruptly ending conciliation without explanation, while Abercrombie was still willing to negotiate; (5) taking an all-or-nothing approach, seeking eleven excessive demands.  Based on these reasons, Abercrombie argues that the Court should exercise its discretion to dismiss the action. *See EEOC v. High Speed Enter., Inc.*, No. CV-08-01789-PHX-ROS, 2010 WL 8367452, at *6 (D. Ariz. Sept. 30, 2010) ("When the EEOC fails to satisfy its statutory

obligation to conciliate in good faith, the Court has sound discretion to stay the matter or dismiss it.")[10]

Plaintiffs counter that they engaged in significant efforts to settle this action, along with the *Banafa* and *Elauf* actions, prior to the filing of the Complaint.  Using the deferential standard of review, the EEOC argues it did conciliate in good faith.[11]

Given the extensive discussions between the parties, the Court agrees with Plaintiffs and declines to exercise its discretion to dismiss this action.[12]  Abercrombie's arguments that the EEOC failed to respond to the reasonable attitudes of the employer and took an all-or-nothing approach establish nothing except that the parties took different positions on the scope of appropriate relief.  Further, Abercrombie's argument that the EEOC "abruptly ended" conciliation in January 2011 is belied by the fact that the parties continued to negotiate from March through May 2011.  Finally, the Court is not persuaded that updating a charging party and/or providing bcc's to her representative evidence a lack of good faith warranting outright dismissal of an action.  *EEOC v. High Speed Enter., Inc.*, 2010 WL 8367452, at *6 (noting dismissal is a harsh remedy).

For the foregoing reasons, the Court **GRANTS** Plaintiffs' Motion on Abercrombie's affirmative defense that Plaintiffs failed to exhaust administrative remedies, and **DENIES** Defendants' Cross-Motion seeking dismissal for failure to conciliate.  Accordingly, the Court will proceed to address the remaining issues in the parties' motions.

---

[10] Although not related to the issue of good faith, Abercrombie also argues that "[i]n light of Abercrombie's unconditional offer of reinstatement to Khan and its voluntary efforts to ensure future Title VII compliance, . . . the EEOC's conciliation demands are moot."  (Cross-Motion at 13.)

[11] The EEOC agrees with Abercrombie that the Ninth Circuit has not adopted a standard, but argues that "nearly all" of the district courts within the Ninth Circuit have adopted the "deferential" standard.

[12] The Court notes that Abercrombie objects at-large to statements contained in the Mitchell Reply Decl. and exhibits attached thereto because Ms. Mitchell has not been identified as a trial witness that would testify as to the EEOC conciliation process.  The Court disagrees with Abercrombie that this evidence may not be considered at summary judgment under Fed. R. Civ. P. 56(c)(2).

United States District Court
Northern District of California

United States District Court

Northern District of California

**IV.    PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

As discussed above, Plaintiffs move for summary judgment on liability on their claims that Abercrombie failed to accommodate Khan's religious beliefs.  Plaintiffs also seek summary judgment on Abercrombie's affirmative defenses of undue hardship and infringement upon Abercrombie's right to commercial free speech.  The Court will first address liability on the failure to accommodate claims followed by reviewing the affirmative defenses.

**A.    Claims for Religious Accommodation**

**1.    Relevant Statutory Basis for Federal and State Claims**

Plaintiffs move for partial summary judgment on their claims that Abercrombie failed to accommodate Khan's sincerely-held religious belief that Islam required her to wear a hijab, including while at work.

Title VII makes it an "unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges or employment, because of such individual's . . . religion." 42 U.S.C. § 2000e-2(a)(1).  "The term 'religion' includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's . . . religious observance or practice without undue hardship on the conduct of the employer's business."  42 U.S.C. § 2000e(j).

Under California's FEHA, an employer may not refuse to employ a person or "discriminate against a person in compensation or in terms, conditions, or privileges of employment because of a conflict between the person's religious belief or observance and any employment requirement, unless the employer . . . demonstrates that it has explored any available reasonable alternative means of accommodating the religious belief or observance, including the possibilities of excusing the person from those duties that conflict with his or her religious belief or observance or permitting those duties to be performed at another time or by another person, but is unable to reasonably accommodate the religious belief or observance without undue hardship . . . on the conduct of the business of the

employer." Cal. Gov't Code § 12940(l)(1).[13]   The Fair Employment and Housing Commission has

promulgated regulations regarding reasonable accommodations relating to dress standards: "[d]ress

standards or requirements for personal appearance shall be flexible enough to take into account

religious practices." Cal. Code Regs. Tit. 2 § 7293.3(c)(2).

The analysis of a religious discrimination claim is the same under FEHA and Title VII.
*Madsen v. Associated Chino Teachers*, 317 F. Supp. 2d 1175, 1180 (C.D. Cal. 2004).   California

courts have observed that "[a]lthough the wording of [T]itle VII differs in some particulars from the

wording of FEHA, the antidiscriminatory objectives and overriding public policy purposes of the two

acts are identical." *Beyda v. City of Los Angeles,* 65 Cal. App. 4th 511, 517 (Cal. Ct. App. 1998);

*Brooks v. City of San Mateo,* 229 F.3d 917, 923 n.3 (9th Cir. 2000) (quoting *Beyda*).   As such, courts

may rely on federal decisions in interpreting analogous state statutes.   *Brooks,* 229 F.3d at 923 n.3;

*Cook v. Lindsay Olive Growers*, 911 F.2d 233, 241 (9th Cir. 1990) ("Federal precedent applies to

provisions of the California Fair Employment and Housing Act analogous to Title VII.").   The Court

therefore analyzes jointly the claims under both Title VII and FEHA for failure to accommodate.

### 2.    Analytical Framework

The Ninth Circuit applies a two-part framework to analyze Title VII religious

accommodation claims.   A plaintiff must first establish a prima facie case.   If successful, the burden

then shifts to the employer to show that it "initiated good faith efforts to accommodate reasonably the

employee's religious practices *or* that it could not reasonably accommodate the employee without

undue hardship." *Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 606 (9th Cir. 2004) (emphasis

---

[13] Undue hardship under FEHA means "an action requiring *significant difficulty or expense*, when
considered in light of the following factors:
    (1) The nature and cost of the accommodation needed.
    (2) The overall financial resources of the facilities involved in the provision of the reasonable
accommodations, the number of persons employed at the facility, and the effect on expenses and
resources or the impact otherwise of these accommodations upon the operation of the facility.
    (3) The overall financial resources of the covered entity, the overall size of the business of a
covered entity with respect to the number of employees, and the number, type, and location of its
facilities.
    (4) The type of operations, including the composition, structure, and functions of the workforce of
the entity.
    (5) The geographic separateness, administrative, or fiscal relationship of the facility or facilities."
Cal. Gov't Code § 12926(t) (emphasis supplied).

supplied) (citing *Tiano v. Dillard Dep't Stores, Inc.,* 139 F.3d 679, 681 (9th Cir. 1998) and *Lawson v. Washington,* 296 F.3d 799, 804 (9th Cir. 2002)); *Opuku-Boateng v. State of Cal.*, 95 F.3d 1461, 1467 (9th Cir. 1996) ("Only if the employer can show that no accommodation would be possible without undue hardship is it excused from taking the necessary steps to accommodate the employee's religious beliefs.").

Here, Abercrombie does not dispute that Plaintiffs have established a prima facie case.[14] Thus, the burden shifts to Abercrombie to prove it has a defense.  With respect to its burden, Abercrombie only argues that it could not reasonably accommodate Khan without undue hardship.[15]

---

[14] An employee's prima facie case for failure to accommodate requires a showing that (i) she had a bona fide religious belief which conflicted with an employment duty, (ii) she informed her employer of the belief and conflict, and (iii) the employer subjected her to discriminatory treatment because of her inability to fulfill the job requirement.  *Heller v. EBB Auto Co.,* 8 F.3d 1433, 1438 (9th Cir. 1993). Abercrombie does not dispute that Plaintiffs have established the required elements.  First, Khan is Muslim and holds a bona fide belief that Islam requires her to wear a hijab in public, including while she worked in the Abercrombie store.  (UMF 1; Khan Dep. 48:17–20, 50:14–51:15.)  Second, when asked to remove the hijab, Khan informed Abercrombie that her religious beliefs prohibited her from removing it while at work.  (UMF Nos. 16, 17, 19 & 20.)  Third, Abercrombie suspended Khan when she initially informed them she could not remove the hijab, and Abercrombie later terminated her when she reaffirmed the same.  It is undisputed that Khan was terminated "for non-compliance with the company's Look Policy."  (UMF No. 22.)  Khan's only violation of the Look Policy was the headscarf.

[15] The Court notes that the record is devoid of any evidence that Abercrombie actually initiated good faith efforts to accommodate Khan.  The only option offered to Khan was "to comply with The Look Policy" or, put another way, to "wear the hijab on her own personal time" but not in the store. (Yoakum Dep. 96:13–97:13.)  Yoakum did not consider allowing Khan to wear her hijab in store colors because it was still headwear prohibited by the Look Policy (Yoakum Dep. 100:13–20), despite the fact that she had been wearing it in store colors for the prior four months.  Moreover, although Yoakum explains that she spoke with Khan as part of an "interactive process" regarding her hijab, Yoakum had already stated to Chmielewski prior to the initial phone conversation:  "If she responds that it is against her religion and she can't [remove her hijab during shifts], we will tell her that she will be taken off the schedule and once we have made a decision we will notify her[.] . . . We will then request her last check and when it comes we will set a time for her to come in and terminate her employment."  (Mitchell Motion Decl., Ex. 9.)  Yoakum also testified that she had already decided to terminate Khan prior to the second phone call in which they discussed whether she could remove her hijab while at work.  (Yoakum Dep. 102:23–103:3.)

United States District Court

Northern District of California

### 3.     Undue Hardship Defense

To establish undue hardship, an employer must show that a requested accommodation would result in "more than a de minimus cost."  *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 84 (1977).  In the Ninth Circuit, heightened proof of the undue hardship defense is required.  *EEOC v. Abercrombie & Fitch Stores, Inc.*, No. 10-CV-03911-EJD, 2013 WL 1435290, at *14 (N.D. Cal. Apr. 9, 2013); *Anderson v. General Dynamics Convair Aerospace Division*, 589 F.2d 397, 402 (9th Cir. 1978) ("Undue hardship means something greater than hardship.")  Hypothetical or merely conceivable hardships cannot support a claim of undue hardship.  *Tooley v. Martin-Marietta Corp.*, 648 F.2d 1239, 1243 (9th Cir. 1981); *Anderson*, 589 F.2d at 402 ("Undue hardship cannot be proved by assumptions nor by opinions based on hypothetical facts.").  The Ninth Circuit is skeptical of "'hypothetical hardships' based on assumptions about accommodations which have never been put into practice."  *Anderson*, 589 F.2d at 402; *Heller*, 8 F.3d at 1440.  Rather, undue hardship requires proof of actual imposition or disruption.  *Tooley*, 648 F.2d at 1243 (citing *Anderson*, 589 F.2d at 402).  Both the magnitude and the fact of hardship require an examination of the facts of each specific case.  *Tooley*, 648 F.2d at 1243.

Abercrombie argues that it has produced sufficient evidence precluding summary judgment on its undue hardship affirmative defense.  Importantly, it posits that it need not show economic harm to prove undue hardship nor that such proof be proffered with specificity or exactitude.  (Cross-Motion at 18 (citing *Balint v. Carson City, Nevada*, 180 F.3d 1047, 1054 (9th Cir. 1999) and *Cook v. Chrysler*, 981 F.2d 336, 339 (8th Cir. 1992).)  In support of this position, Abercrombie offers testimony from numerous employees, who testified that—based on their "personal experiences"— compliance with the Look Policy is key to Abercrombie's success and/or that deviations from the policy "detract from the in-store experience and negatively affect [the] brand."  (Cross-Motion at 19– 20.)  Abercrombie argues that its Look Policy goes to the "very heart of [its] business model" and thus any requested accommodation to deviate from the Look Policy threatens the company's success.

Plaintiffs counter that Abercrombie's evidence of undue hardship is speculative and fails to include "specific admissible evidence" showing the degree to which compliance with the Look Policy affects store performance or brand image, or causes financial hardship.  In particular, the evidence fails to show: (i) that Khan's wearing of a hijab during her four months of employment had a negative

United States District Court

Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

effect on sales, the brand, or any customer's experience; nor (ii) any tracking or correlation between Look Policy deviations, including wearing a hijab, and a negative impact on sales.[16]  Plaintiffs also emphasize that the offer to reinstatement Khan as a PTI associate with an accommodation to wear her hijab is inconsistent with any claim of hardship.[17]  In sum, Plaintiffs argue that "Abercrombie has failed to produce even one document, survey, customer complaint, sales report or financial statement linking an employee's non-compliance with the Look Policy with an adverse impact on its brand or bottom line, or as the root cause of some sort of customer confusion."  (Motion at 20.)

As a preliminary matter, the Court disagrees with Abercrombie's view of the nature of evidence required to sustain its burden.  The Ninth Circuit in *Balint* did not hold that economic harm is not required per se.  Rather, in that case the Ninth Circuit noted that undue hardship "could include 'additional costs in the form of lost efficiency or higher wages,'" but that it may also exist where "an accommodation would cause more than a de minimis impact on coworkers, such as depriving coworkers of seniority rights or causing coworkers to shoulder the plaintiff's share of potentially hazardous work." *Balint*, 180 F.3d at 1054.

Here, Abercrombie only offers unsubstantiated opinion testimony of its own employees to support its claim of undue hardship.  The deposition testimony and declarations from Abercrombie witnesses demonstrate their personal beliefs, but are not linked to any credible evidence.  Khan had worked at Abercrombie for four months before Chmielewski observed her during a site visit.

---

[16] Plaintiffs further argue that Abercrombie fails to establish that customers are "confused" by an employee wearing a hijab because the hijab is inconsistent with the brand, or a likelihood that granting Khan's accommodation would have led to a floodgate of requests for Look Policy exceptions by other employees.

[17] Further undercutting its claim of undue hardship is the fact that Abercrombie has granted "almost 80 Look Policy exceptions since at least 2005" including: (i) allowing male employees to grow facial hair or wear a yarmulke or baseball cap; (ii) allowing female employees to wear visible jewelry (including a cross) or a long skirt that was inconsistent with the store's look; and (iii) granting more than 16 exceptions *for headscarves* since 2006.  (Motion at 15, 17).  On this point, Abercrombie responds that the majority of permitted exceptions to the Look Policy "were made when religious garb was not observable" and were "thus distinguishable from Khan's request to wear a highly visible headscarf."  (Cross-Motion at 19–22 (other exceptions granted for medical reasons or to employees in non-customer-facing positions).)

United States District Court
Northern District of California

Abercrombie failed to proffer any evidence from those four months showing a decline in sales in the Hillsdale store; customer complaints or confusion; or brand damage linked to Khan's wearing of a hijab.  (*See* Mitchell Motion Decl., Ex. 3 [Videotaped Deposition of Adam Chmielewski ("Chmielewski Dep.")] 155:12–16 (Abercrombie did not receive complaints about Khan while she was employed) & 155:20–23 (did not know of any change in sales from the time of Khan's hire to departure).)[18]  Moreover, Yoakum, who terminated Khan, testified that Khan's hijab was a violation of the Look Policy *regardless* of how much or little time she spent on the sales floor (Yoakum Dep. 94:1–13) and *without consideration* of whether the hijab was distracting to customers (*id.* 99:12–18). Without evidence of *any* negative effect resulting from Khan's hijab, Abercrombie cannot establish that accommodating Khan in this instance would have caused an undue hardship.

　　　　To the extent that Abercrombie argues more broadly that an accommodation for Khan would have threatened the core of its business model and the company's overall success, the Court is not persuaded.  Each Abercrombie witness testified that they believe deviations from the Look Policy harm sales and/or customers' experiences in the store.  None were able to provide a more concrete basis than that it was their "belief" based on "personal experience" that such harms result.  Notably, employees could not identify any reports, surveys, or complaints as a basis for their beliefs.[19]  In fact, two Abercrombie sales executives testified that Abercrombie does not specifically examine the effect of the Look Policy on sales.  James Roth, former Director of Stores and current Director of Stores for Asia-Pacific, testified that Abercrombie "wouldn't look" specifically at a link between the Look

---

[18] Additional excerpts of the Chmielewski Dep. were attached to the Clark Decl., Ex. C.

[19] (Clark Decl., Ex. B [Deposition of Jessica Passalacqua ("Passalacqua 10/1/12 Dep.")] 191:22–192:16 & 195:11–21 (cannot identify any empirical data to support the belief) and Mitchell Reply Decl., Ex. 25 (also "Passalacqua 10/1/12 Dep.") 96:16–24 (not aware of studies determining whether permitting deviations in Look Policy had negative impact on sales); Mitchell Reply Decl., Ex. 23 [Deposition of Jessica M. Passalacqua ("Passalacqua 6/25/09 Dep.")] 20:21–21:6 (no reports showing lost sales in particular stores because employees are not properly dressed); Chmielewski Dep. 199:4–25 (belief not based on any report, customer complaints, or employee complaints); Fugarino Dep. 307:22–25 (has not personally seen studies regarding poor store experience and negative impact on sales) & 309:10–14 (not aware of customer complaints about employees wearing headscarves); Moorefield Dep. 267:13–18 (does not know of any studies, reports, or analyses performed to determine whether allowing model to wear a yarmulke had negative effect on sales).)

United States District Court
Northern District of California

United States District Court

Northern District of California

1    Policy component of the in-store experience and an increase or decrease in sales.  (Clark Decl., Ex. H

2    [Deposition of James Roth ("Roth Dep.")] 187:8–12.)  In addition, Director of Sales Jessica

3    Passalacqua testified that Abercrombie does not measure in any report how much money is lost at a

4    store because employees are not properly dressed, nor does it focus on drawing a correlation between

5    the Look Policy and financials.  (Passalacqua 6/25/09 Dep. 20:21–21:6 & 33:7–34:3.)

6            To the extent that employees were able to identify specific instances upon which their beliefs

7    are based, those instances are speculative and purely subjective in nature.  Three examples are

8    noteworthy.  First, Chmielewski testified that he took over the Palo Alto store, which had "Look

9    Policy issues," but that with training on the policy, "sales increased dramatically over time."

10   However, he also testified that the Look Policy was only "[o]ne of many" problems in the Palo Alto

11   store.  (Chmielewski Dep. 60:25–61:13 & 201:5–16.)  Second, executive Timothy McKinsey

12   identified the Valley Fair store as not doing a good job of protecting the brand and being "a concern

13   for a significant period of time."  In addition to having Look Policy issues and declining sales, though,

14   Valley Fair also had staffing issues where the employees were not outgoing.  (Clark Decl., Ex. D

15   [Deposition of Timothy John McKinsey ("McKinsey Dep.")] 41:10–44:18.)[20]  Third, Group Vice

16   President of Human Resources Deon Riley testified as follows when asked whether allowing the *hijab*

17   *accommodations* had any negative impact on sales:  "I was going to say I'm unable to say whether

18   they have a negative impact on sales because I don't study the impact on sales.  [¶]  However, our

19   goal is to provide the right customer service, or the right customer in-store experience, and our policy

20   is part of that.  We've had very slow sales in the past two years, but I wouldn't say that was just

21   because of hijabs.  I'm sure the economy played a part, but that would just be purely speculative."

22   (Mitchell Reply Decl., Ex. 22 [Deposition of Deon Riley ("Riley 3/17/11 Dep.")] 236:7–19.)  These

23   _____

24   [20] (*See also* Passalacqua 10/1/12 Dep. 262:9–263:24 (based on experience in Germany store where
     two employees wore too much eye makeup, believes that deviation or stores that don't comply with
25   Look Policy will "typically" lead to other deviations); Fugarino Dep. 298:19–300:17 (basis of belief
     regarding Look Policy exceptions damaging brand is "observations [and] . . . personal experiences
26   and conversations with regional managers," who told Fugarino that cause for low sales was "*either*
     they don't have great associates working *or* those associates aren't in Look Policy *or* there is another
27   store experience element that's impacting it.  Those are *sometimes* the cause from their perspective.")
     (emphasis supplied).)

28

examples provide only a tenuous, potential connection between the Look Policy and undue hardship, as "other" store issues contributed to declining sales and the evidence does not establish an actual imposition or disruption as is required in the Ninth Circuit.[21]

Abercrombie must provide more than generalized subjective beliefs or assumptions that deviations from the Look Policy negatively affect the sales or the brand. The evidence presented does not raise a triable issue that a hardship, much less an undue hardship, would have resulted from allowing Khan to wear her hijab, particularly where she had already been wearing the hijab on the job for four months without any complaints, disruption, or a noticeable effect on sales. A reasonable jury could not conclude that Abercrombie would be unduly burdened by allowing Khan to continuing wearing her hijab as she had been prior to February 2010.

For the foregoing reasons, the Court **GRANTS** Plaintiffs' Motion as to Abercrombie's undue hardship affirmative defense.

**B.      Commercial Speech Affirmative Defense**

Notwithstanding the foregoing, Abercrombie has proffered an affirmative defense of commercial free speech under the First Amendment as protection from liability. Plaintiffs request summary judgment on this defense, contending: (i) the conduct at issue does not involve commercial speech; and (ii) even if commercial speech exists, any restriction thereon is permissible under Supreme Court precedent.

Commercial speech is that "which does 'no more than propose a commercial transaction.'" *Valle Del Sol Inc. v. Whiting*, 709 F.3d 808, 818 (9th Cir. 2013) (quoting *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.,* 425 U.S. 748, 762 (1976)). The test for determining whether commercial speech exists is set forth in *Bolger v. Youngs Drug Products Corp.* There, the Supreme Court held that commercial speech can be found where the speech: (i) is an advertisement; (ii) refers

---

[21] Plaintiffs have objected to the Declaration of James Roth (Clark Decl., Ex. A) at paragraphs 12–13 on the ground that Abercrombie refused to produce and eventually stipulated not to rely on sales reports not produced in this action, but such reports would have allowed Plaintiffs to test the validity of the statements Roth now makes to oppose summary judgment. The objections are **DENIED** as moot. The statements at issue do not change the outcome. They are merely ambiguous assertions of a purported negative effect on sales and do not establish an undue hardship, as Roth provides no quantification of said negative effect.

United States District Court
Northern District of California

to a particular product; and (iii) the speaker has an economic motivation for the speech.  463 U.S. 60, 66–67 (1983) (holding that the "combination of *all* these characteristics" provided "strong support" that the pamphlets at issue were properly characterized as commercial speech).  Commercial speech is entitled to constitutional protection, albeit a lesser degree of protection than is afforded to other forms of speech.  *See Central Hudson Gas & Elec. Corp. v. Public Service Comm'n of New York*, 447 U.S. 557, 562–63 (1980).

Abercrombie uses a novel argument that the *Bolger* elements are met because the store associates should be classified as "living advertisements" for the brand and therefore their appearance is protected as commercial speech.  As such, the "speech" promotes the product of the Hollister brand's California beach-inspired clothing and  the use of store associates to advertise is economically driven.

As a threshold matter, Plaintiffs counter that a PTI employee's appearance is not commercial speech protected by the First Amendment because no basis exists to consider them "living advertisements."  PTI employees are essentially stockroom employees responsible for receiving shipments, folding clothes, and placing clothes on the sales floor.  They are not hired to serve as "living advertisements" of Abercrombie's brands, and thus their appearances cannot constitute the same.  Second, Abercrombie never identifies a particular product as being advertised.  Employees are not required to wear clothing sold in the stores, and are allowed to wear other clothing brands.[22]

The Court agrees there is no commercial speech.  Abercrombie has not provided any authority supporting its novel argument, nor can it meet *Bolger* under the facts of this case.  Abercrombie requires all employees, including PTIs such as Khan, to "represent the brand."  (*See* Fugarino Dep. 314:11–24 ("Models are expected to represent the brand to customers.  And impacters may be, depending upon the head count at the store, out on the floor often.  If they are gonna be out on the floor, then we would want them representing the brand in terms of their style and grooming.").)

---

[22] Even if a PTI employee's appearance is somehow considered commercial speech, Plaintiffs argue that commercial speech may be regulated by the government if certain requirements are met under *Central Hudson*.  *See* 447 U.S. at 564; *Valle Del Sol*, 709 F.3d at 820–21.  The Court need not reach this issue.

United States District Court

Northern District of California

However, "representing the brand" does not equate to being a "living advertisement," particularly where the employees' responsibilities consist of ensuring shipments are complete, folding clothing, and placing/replacing clothing on the floor.  (Yoakum Dep. 59:9–24, 60:5–9; Khan Dep. 76:6–13, 77:5–8; Moorefield Dep. 34:16–23.)  These duties are primarily performed in the stockroom.  Moreover, employees are not even wearing, necessarily, the products being sold.[23]  Thus, the PTI employees' appearance does not promote a particular product under *Bolger* nor does it "propose a commercial transaction" (*Valle Del Sol*, 709 F.3d at 818 (quoting *Va. State Bd. of Pharmacy,* 425 U.S. at 762)).

For these reasons, the Court **GRANTS** Plaintiffs' Motion on Abercrombie's affirmative defense based on infringement upon its right to commercial free speech.

There being no viable defense, the Court hereby **GRANTS** Plaintiffs' Motion as to liability on Plaintiffs' claims for failure to accommodate under Title VII and FEHA.

## V.   DEFENDANTS' CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT

Having already addressed Abercrombie's affirmative motion seeking dismissal based on a purported failure to conciliate, *supra*, the only remaining issues in Abercrombie's Cross-Motion relate to Plaintiffs' claims for injunctive relief and punitive damages.

### A.   Injunctive Relief

The EEOC seeks a permanent injunction enjoining practices which discriminate based on religion, and an order that Abercrombie institute policies, practices, and programs providing equal employment opportunities for employees of all religions and which "eradicate" effects of past unlawful practices.  Khan seeks all injunctive relief necessary to bring Defendants into compliance with Title VII and FEHA.

---

[23] Notably, Abercrombie created the role of the "impact" employee to *allow* Models to remain on the sales floor to see, greet, and help customers.  (Moorefield Dep. 50:8–51:14.)  The distinction between PTI employees and Models is further evidenced by the fact that during the interview process, the styling and appearance of PTI candidates are not assessed.  (Riley 3/14/12 Dep. 86:3–13.)  On the other hand, Models were required to be handsome and good-looking in order to "[r]epresent [Abercrombie]."  (Moorefield Dep. 98:18–21.)  Notwithstanding the foregoing, the Court does not opine on the use of the defense in the context of Models.

"Generally, a person subjected to employment discrimination is entitled to an injunction against future discrimination, unless the employer proves it is unlikely to repeat the practice." *E.E.O.C. v. Goodyear Aerospace Corp.*, 813 F.2d 1539, 1544 (9th Cir. 1987) (citations omitted). "[V]oluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, *i.e.*, does not make the case moot." *County of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979) (quoting *United States v. W. T. Grant Co.*, 345 U.S. 629, 632 (1953)). However, an injunction may be unnecessary where there is no reasonable expectation that the alleged violation will recur *and* "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *County of Los Angeles*, 440 U.S. at 631. To obtain an injunction, the "necessary determination is that there exists some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive." *W. T. Grant Co.*, 345 U.S. at 633.

Abercrombie argues Plaintiffs' desired injunctive relief is inappropriate for three reasons. First, Abercrombie offered Khan unconditional reinstatement with the accommodation of wearing the hijab. Second, it is inappropriate to enter an injunction where there is no threat of future, recurring violations. Abercrombie details significant policy changes it has made since February 2010.[24] Third, the injunction sought is itself overbroad in that it seeks nationwide relief beyond the scope of the instant case and generically requires Abercrombie to comply with the law, enjoin discriminatory practices, and implement policies that provide equal opportunities and eradicate effects of past discrimination.

Plaintiffs respond that under Title VII, a court has the authority to order any "equitable relief as the court deems appropriate" to enjoin an employer who has engaged in unlawful employment

---

[24] First and foremost, Abercrombie changed its policies and procedures to ensure that religious accommodations requests would be handled appropriately, which included issuing guidance and training employees to contact Human Resources for any conflict between the Look Policy and an employee's religious beliefs. (Fugarino Dep. 47:8–48:17.) Second, Abercrombie provided a supplement to the Look Policy, which provided sketches of permissible manners of wearing a headscarf and clearly recognizes a duty to interact with employees requesting accommodations. (*Id.* 48:18–49:4 & Ex. 19.) Third, Abercrombie provided thorough training relating to religious accommodations to management and HR personnel. (Yoakum Dep. 123:15–125:16.) Fourth, since Khan's termination, Abercrombie has permitted several employees to wear headscarves as religious accommodations. (*Id.* 300:11–20.)

United States District Court
Northern District of California

practices.  42 U.S.C. § 2000e-5(g)(1).  They argue a material question of fact exists as to whether

(i) the wrongful conduct at issue in this case is reasonably likely to recur and (ii) Abercrombie's

efforts thus far have completely eradicated the effects of the alleged violations.  Specifically, Plaintiffs

contend there are insufficient assurances that violations will not recur where an employer "takes

curative actions only after it has been sued."   *EEOC v. Goodyear Aerospace Corp.,* 813 F.2d at 1544.

Here, Abercrombie revised its Look Policy, but only after lawsuits with the EEOC.  Thus, Plaintiffs

argue it is plausible that Abercrombie may resort to prior practices without an injunction.  Plaintiffs

urge that Abercrombie's repeated assertion of an undue hardship defense shows a need for injunctive

relief despite its changes in practices.

Finally, Plaintiffs argue that the requested injunctions do more than require Abercrombie to

comply with the law; they seek for Abercrombie to adopt policies, practices, or programs that will

eradicate the effects of past and present unlawful employment practices.  *See EEOC v. Goodyear

Aerospace Corp.*, 813 F.2d at 1544 (requested injunction was not superfluous because, among other

things, it would "subject [defendant] to the contempt power of the federal courts if it commits future

violations" and "reduce the chilling effect of [defendant's] alleged retaliation").

Based on the totality of the record, the Court finds that a triable issue exists as to whether the

recent changes in Abercrombie's policies have completely and irrevocably eradicated the effects of

the alleged violation.  *County of Los Angeles*, 440 U.S. at 631.  Most notably, Abercrombie's own

executives suggest that the changes were based not so much on the laws prohibiting its conduct, but

on "the distraction of all of the litigation[, which caused] tying up of resources to deal with the

litigation."  (Riley 3/17/11 Dep. 102:8–16.)  Second, numerous Abercrombie witnesses continue to

believe that allowing employees to wear hijabs has an adverse impact on sales or hurts the

Abercrombie brand.  (Passalacqua 10/1/12 Dep. 191:22–192:11 & 194:21–195:4; Fugarino Dep.

242:5–17; Yoakum Dep. 291:16–292:9 (still believes that exception for headscarf creates an undue

burden).)  Finally, the record is not developed sufficiently to assess fully whether the requested relief

is, in fact, overbroad.

For these reasons, the Court **DENIES** Abercrombie's Cross-Motion seeking summary judgment

on Plaintiffs' claims for injunctive relief.

United States District Court

Northern District of California

1

**B.      Punitive Damages**

2        Plaintiffs seek punitive and exemplary damages in the Complaint and Complaint in

3  Intervention.  Abercrombie contends that punitive damages are not warranted in this case.

4        Title VII explicitly provides for punitive damages when a defendant engages in a

5  discriminatory practice "with malice or with reckless indifference to the federally protected rights of

6  an aggrieved individual."  42 U.S.C. § 1981a(b)(1).  The standard for determining whether evidence is

7  sufficient to present a claim for punitive damages to a jury is governed by *Kolstad v. Am. Dental*

8  *Ass'n*, 527 U.S. 526 (1999).  In *Kolstad*, the Supreme Court stated that an employer may be liable for

9  punitive damages where it "discriminate[s] in the face of a perceived risk that its actions will violate

10 federal law."  *Id.* at 536.  Under this analysis, "in general, intentional discrimination is enough to

11 establish punitive damages liability," but egregious conduct is not required.  *Passantino v. Johnson &*

12 *Johnson Consumer Prods., Inc.*, 212 F.3d 493, 515 (9th Cir. 2000).  The Ninth Circuit has further

13 expanded on the instances in which intentional discrimination does not give rise to punitive damages

14 liability:

15          The [*Kolstad*] Court set forth three areas in which the factfinder could find intentional
           discrimination but the defendant would nonetheless not be liable for punitive
16          damages.  First, if the theory of discrimination advanced by the plaintiff was
           sufficiently novel or poorly recognized, the employer could reasonably believe that its
17          action was legal even though discriminatory.  Second, the employer could believe it
           had a valid [bona fide occupational qualification] defense to its discriminatory
18          conduct.  Third, in some (presumably rare) situations, the employer could actually be
           unaware of Title VII's prohibition against discrimination.  Common to all of these
19          exceptions is that they occur when the employer is aware of the specific
           discriminatory conduct at issue, but nonetheless reasonably believes that conduct is
20          lawful.  Under such circumstances, an employer may not be liable for punitive
           damages.
21

22
23 *Id.* at 515 (citing *Kolstad*, 527 U.S. at 536–37).  The *Kolstad* Court also held that "an employer may

24 not be vicariously liable for the discriminatory employment decisions of managerial agents where

25 these decisions are contrary to the employer's good faith efforts to comply with Title VII."  *Swinton v.*

26 *Potomac Corp.*, 270 F.3d 794, 810 (9th Cir. 2001) (quoting *Kolstad*, 527 U.S. at 545) (internal

27 quotations omitted).

28

United States District Court
Northern District of California

United States District Court
Northern District of California

1   Abercrombie argues punitive damages are inappropriate because it maintains anti-

2   discrimination and harassment policies, trains its managers on diversity and equal opportunities,

3   maintains a comprehensive process for addressing requests for religious and other accommodations—

4   all in good faith.  *If* Yoakum discriminated against Khan, this was itself in violation of Abercrombie's

5   policies and her own training.  In addition, Abercrombie argues that the purposes behind punitive

6   damages (punishment and deterrence from future wrongdoing) are not served here.  Abercrombie

7   emphasizes that it promptly repudiated Yoakum's decision to terminate Khan by offering her

8   unconditional reinstatement with an accommodation and undertook measures to address the

9   circumstances that led to Khan's termination, which render punitive damages unnecessary.

10   By contrast, Plaintiffs argue that triable issues exist with respect to the motivations for

11   Abercrombie's conduct.  First, evidence exists that Khan was fired in the face of a perceived and

12   obvious risk that Abercrombie's actions violated federal law.  *Passantino*, 212 F.3d at 515.  Under

13   *Kolstad*, Plaintiffs argue that Yoakum, who served as Abercrombie's Senior Human Resources

14   Manager, constitutes a managerial agent for punitive damage purposes and she was also responsible

15   for implementing anti-discrimination policies.  Moreover, Plaintiffs argue that Yoakum consulted

16   Senior Legal Counsel Stacia Jones, Senior VP of Diversity Todd Corley, and Director of Sales Tony

17   Park regarding accommodating Khan, but she nonetheless failed to engage in any dialogue with Khan

18   to identify an accommodation and only offered her the option of removing it.[25]  (Reply at 13 ("Given

19   the evidence that at least four high level executives were involved in the decision to suspend and fire

20   [her], a jury could find that Defendants acted in reckless disregard of its Title VII obligations."); *see*

21   Yoakum Dep. 65:21–68:14.)

22   Plaintiffs next argue that there is a triable issue of fact over whether Abercrombie *implemented*

23   its policies in good faith *at the time of Khan's termination*, given that Yoakum was charged with

24   ───────────────────

25   [25] Although responding to arguments made by Plaintiffs in their Reply, Abercrombie affirmatively
    argues for the first time in its Sur-Reply that punitive damages are not appropriate because there was

26   no wrongful action taken by a managerial agent.  The Court notes that regardless of whether the
    inclusion of this affirmative argument was proper in Sur-Reply, triable issues exist regarding the

27   status of the various actors in Abercrombie's corporate structure.  *See Passantino*, 212 F.3d at 516
    ("[W]hile the actors here were clearly managerial, it is not apparent to us exactly how senior they

28   were. . . . A determination regarding the status of the principal actors is crucial to the outcome . . .").

25

implementing those policies and also committed the discriminatory act at issue.  *See Swinton*, 270 F.3d at 810–11 ("[I]t is well established that it is insufficient for an employer simply to have in place anti-harassment policies; it must also implement them.").  Plaintiffs assert that Abercrombie's *after-the-fact* offer of reinstatement and policy changes do not insulate it from liability for punitive damages.  *Id.* at 815 ("evidence of post-charge remediation would not automatically bar the imposition of punitive damages" and a jury would be free to discount such evidence).

The Court finds that given the facts of this case, a jury could find that punitive and exemplary damages are appropriate.   Reasonable jurors could determine that by offering Khan one option—to remove her hijab despite her religious beliefs—Abercrombie acted with malice, reckless indifference or in the face of a perceived risk that its actions violated federal law.  42 U.S.C. § 1981a(b)(1); *Kolstad*, 527 U.S. at 536.  Triable issues also remain regarding whether Abercrombie implemented its antidiscrimination policies in effect at the time of Khan's termination in good faith.  Finally, the record is not fully developed regarding Abercrombie's implementation of its newly-adopted policies, such that the Court cannot determine whether the purposes of punishment or deterrence are served with an award of punitive damages.

For these reasons, summary judgment on the claim for punitive damages is not warranted and the Cross-Motion on that ground is **DENIED**.

## VI.    CONCLUSION

For the foregoing reasons, the Court **GRANTS** Plaintiffs' Motion for Partial Summary Judgment.  Specifically, summary judgment is granted in favor of Plaintiffs on Abercrombie's (i) sixth affirmative defense (failure to exhaust administrative remedies), (ii) eighth affirmative defense (undue hardship), and tenth affirmative defense (infringement upon Abercrombie's right to commercial free speech).  Consequently, there being no viable affirmative defense, summary judgment is granted in favor of Plaintiffs as to liability on their claims that Abercrombie failed to accommodate Khan's religious beliefs.

Further, the Court **DENIES** Defendants' Cross-Motion for Partial Summary Judgment in its entirety and will not dismiss the action for failure to conciliate or dismiss Plaintiffs' requested relief for an injunction or punitive damages.

This Order terminates Dkt. Nos. 97 & 103.

**IT IS SO ORDERED.**

Dated: September 3, 2013

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**